197 F.Supp.2d 226 (2001)
CITIZENS ADVISORY COMMITTEE ON PRIVATE PRISONS, INC., Plaintiff,
v.
UNITED STATES DEPARTMENT OF JUSTICE, Federal Bureau of Prisons, Defendants.
Civil Action No. 99-112J.
United States District Court, W.D. Pennsylvania.
August 7, 2001.
*227 *228 *229 *230 *231 William T. Jones, Robert A. Preate, Levy & Preate, Scranton, PA, for plaintiff.
Jessica Lieber Smolar, U.S. Attorney's Office, Pittsburgh, PA, Lori Caramanian, Anthony P. Hoang, U.S. Dept. of Justice, Env. & Natural Resources Div., General Litigation Section, Washington, DC, Jeff Limjoco, Office of General Counsel & Review, Washington, DC, for defendant.

MEMORANDUM OPINION AND ORDER
D. BROOKS SMITH, Chief Judge.
In December 1998, Cornell Corrections Inc. ("Cornell") submitted a proposal to the Federal Bureau of Prisons ("Bureau") to house over 1,000 federal inmates in a private prison that it hoped to build in Clearfield County, Pennsylvania. In April 1999, the Bureau awarded Cornell the contract and Cornell moved forward with construction of the new facility. Within weeks, plaintiff Citizens Advisory Committee on Private Prisons, Inc. ("CACOPP" or "plaintiff")[1] sued the Bureau and the United States Department of Justice ("defendants"), seeking to enjoin the construction of this new prison. In particular, plaintiff claimed that defendants had failed to comply with the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321-4327 (1994), a statute that requires federal agencies to consider environmental consequences before committing significant resources to a project. Basically admitting that it had violated NEPA, the Bureau ordered a halt to all work on the new facility and began to re-examine the environmental impact of the project. In March 2000, it issued an environmental assessment ("EA") in which it concluded that construction of the new prison would not have a significant effect on the environment.
The question before me is whether this conclusion, and the process employed to reach it, satisfies NEPA's requirements. My own conclusion comes in three (3) parts. First, I conclude that the Bureau violated NEPA when it initially awarded the contract to Cornell and allowed construction on the project to proceed without taking a "hard look" at the environmental consequences of the project. Second, I consider whether the Bureau cured this initial violation by stopping work on the project and re-evaluating the project's environmental consequences. While I acknowledge that this is a question not susceptible of easy resolution, I ultimately conclude that the Bureau did cure its initial violation. Finally, I examine the Final EA prepared by the Bureau in March 2000 and uphold the Bureau's decision that the Clearfield County project will not have a significant effect on the environment. Accordingly, I hold that the defendants have satisfied NEPA's requirements, and I will *232 allow the Clearfield County project to proceed.

I
On August 5, 1997, the United States Congress enacted the National Capital Revitalization and Self Government Improvement Act of 1997, Pub.L. No. 105-33, 111 Stat. 251. Among other things, the Act required the Bureau to house at least 2,200 District of Columbia Department of Corrections (DCDC) sentenced felons in private contract facilities by December 31, 1999. A.R. Vol. I, tab. 1.[2] In addition, the Act mandated that the Bureau place 50% of all DCDC inmates in private prison facilities by September 30, 2002. Id. Vol. I, tab 4, at 5.
In an effort to meet its obligations under the Act, the Bureau took two (2) immediate steps. First, it started to broadly consider the environmental consequences of this mandate to house DCDC inmates in private correctional facilities. On January 26, 1998, it published a notice in the Federal Register, in which it stated that it was going to prepare a Draft Program Environmental Impact Statement ("EIS"). Id. Vol. I, tab 4, App. A. The purpose of this Draft Program EIS was to analyze the environmental effects of moving 2,200 prisoners from public to private prison facilities. On January 28, 1998, the Bureau held a public meeting to discuss the substance of this Draft Program EIS. And in March 1998, it published this document. Id. Vol I, tab 4. In the Draft Program EIS, the Bureau concluded that housing prisoners in private facilities would not have an adverse effect on the environment. Id. Vol I, tab 4, Abstract. Accordingly, it decided to forge ahead with plans to find private contractors to house approximately 2,200 DCDC inmates by December 31, 1999. Id. After a brief public comment period, the Bureau issued a Final Program EIS that drew the same conclusions. Id. Vol. II, tab 5. Although the Final Program EIS discussed a broad range of environmental issues that might arise during the construction and operation of a private prison, it did not discuss any site in particular.
The second step taken by the Bureau was to issue a request for proposals for the housing of 2,200 DCDC sentenced felons in private institutions. Id. Vol. I, tabs 2 and 3. After a series of amendments, this solicitation was narrowed down to 1,000 inmates. Id. The solicitation stated that private institutions must begin accepting inmates by December 31, 1999. Finally, it required that each proposal be accompanied by a Draft EA. A.R. Vol I, tab 2, § J, Attach. 6. "In mandating the preparation of the [Draft] EA, the Bureau sought to ensure that each contractor/offeror understood" the need to consider alternative sites and to analyze the full-range of potential environmental impacts on any site that it proposed. Final EA, at I-3.[3]
One of the proposals received by the Bureau was from Cornell. Cornell proposed to build a new prison in Morris and Decatur Townships, Clearfield County, Pennsylvania, approximately one mile *233 northwest of Philipsburg ("Clearfield County site"). Id. at II-2. As the Administrative Record in this case reveals, the proposed site contains two (2) parcels totaling 197 acres and is located among gently rolling hills. Id. at III-1; id. at IV-22; A.R. Vol. XI, tab 128. The larger of the two parcels, Lot 1, is 157 acres and is the site of a former strip mine. Final EA, at III-1. In contrast, Lot 2 is only 40 acres, a quarter of which are wooded. Id. at III-18.
History has not been kind to the Clearfield County site. Past mining activities have taken their toll on much of the site, id. at III-1, 6-7, 29, and past disturbance to the vegetation is obvious. Id. at III-18. Additionally, past use for state-approved sludge nutrient recycling has left portions of the site with arsenic concentrations that exceed the applicable Pennsylvania health standard. Id. at III-30.[4] This history, however, can be deceiving. In fact, a picture of the area reveals a typical rural setting, for the most part sparsely covered with vegetation but thick with trees in limited areas. A.R. Vol. XI, tab 128. A diverse array of animal species, including birds, rabbits, squirrels, and even black bears live in the area and may venture into the site at any time. Final EA, at III-30.[5]
Like the site itself, the surrounding area is rural. Clearfield County is Pennsylvania's fourth-largest county in total land area (1,144 square miles). Id. at III-31. Over three-quarters of the county is wooded and approximately six (6) percent is farmland. Id. at III-31-32. In 1990, the population of Clearfield County stood at 78,101, and was up to 79,724 by 1995. Id. at III-34. Philipsburg is just a mile from the proposed site across the border in Centre County and is one of the major centers of industry and mining in the northwest portion of Centre County. Id. Clearfield County has seen economic trouble over the past twenty (20) years. In 1999, its unemployment rate was 9.3%, well above the statewide and national averages. Id. at III-38-39.
Between December 1998 and April 1999, the Bureau's Contracting Officer, Mr. Scott P. Stermer, reviewed Cornell's proposal to build a prison on the Clearfield County site, along with a number of other proposals received by the agency. Dkt. no. 67, Ex. A, ¶ 7. In particular, he examined the following: (1) the alternative sites considered by the offerors; (2) the letters of support and opposition, if any, to the proposed projects; (3) any information that the offerors supplied to or received from federal, state, and local environmental authorities; (4) the proposed mitigation and environmental permit requirements; (5) any demographic studies on the proposed sites; and (6) the provision of emergency services at the proposed sites. Id.
On April 2, 1999, the Bureau awarded to Cornell a contract for the management of a private correctional facility at the Clearfield *234 County site. Id. ¶ 9; A.R. Vol. III, tab 12. The contract called for the housing of 350 minimum security male offenders, 350 various security male offenders sentenced pursuant to the DC Youth Rehabilitation Act, and 300 female offenders of various security levels. Dkt. no. 1, Ex. 1; A.R. Vol. III, tab 12. It was to run for a period of ten (10) years, with a base period of three (3) years, and seven (7) one (1) year renewal options. Id. For the entire ten (10) year period, the contract price was $342,692,498. Id.
As soon as residents from the Clearfield County area learned that Cornell had received a contract to build a prison in their area, letters for and against the proposed facility began pouring into the Bureau's Washington, D.C. office. Plaintiff's organization took the lead in expressing opposition to the project, gathering over 1,000 signatures of those opposed to the project and mailing letters to the Bureau on a daily basis. A.R. Vol. IV, tabs 18-29, 31-33, 35-43; id. Vol. V, tabs 55 & 57; id. Vol. VI, tab 57. Opponents of the project focused on the lack of public participation in the selection of the Clearfield County site, the environmental consequences of building on the proposed site, the impact that the site would have on local services, and health and safety concerns. Id. Vol. IV, tabs 18-29, 31-33, 35-43; id. Vol. V, tabs 55 & 57; id. Vol. VI, tab 57. While opposition to the project was vigorous, the more vocal response from members of the Clearfield County community was one of support. Id. Vol IV, tabs 44-52; id. Vol V, tab 53 (2,649 signatures in favor of the proposed project); id. Vol VII, tab 89 (575 signatures in favor of the project). In contrast to the opponents of the project, the supporters focused on one thing: jobs. Time and again, they explained their dire economic plight and noted that the prison would boost the County's sagging economy. Id. Vol IV, tabs 44-52; id. Vol V, tab 53; id. Vol VII, tab 89.
At the end of the day, neither public opposition nor support for the project altered Cornell's plans to move ahead with its contract. According to the contract, Cornell had to have the prison finished within 270 days, id. Vol. III, tab 12, at 40, and it moved quickly to achieve this goal. Within days of receiving its contract from the Bureau, Cornell applied for a building permit which it received on April 7, 1999. Final EA, at VIII, doc. no. 35, Attachs. B & C. A groundbreaking ceremony was held on May 24, 1999 and construction began the following day. Final EA, Ex. I-1. In the local newspapers, David Cornell, Chief Executive Officer of Cornell, claimed that the new facility would be built and ready for business by "the first quarter of 2000." Dkt. no. 1, Ex. 2.
On May 28, 1999, plaintiff filed a Complaint in this case, alleging violations of NEPA dkt. no. 1, and sought an order enjoining the construction of the new facility. Dkt. no. 2. NEPA requires federal agencies, like the Bureau, to take the environmental factors into account before proceeding with major federal actions. 42 U.S.C. § 4332; 40 C.F.R. § 1501.1 (2000); Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 371, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). In addition, NEPA mandates that agencies prepare an EIS for any major federal project that will "significantly affect[] the quality of the human environment." 42 U.S.C. § 4332(2)(C)(i). In its Complaint, plaintiff argued that the Bureau had failed to comply with NEPA on two fronts. First, it claimed that the Bureau failed to consider environmental issues before awarding the prison contract to Cornell. Second, it argued that the Bureau failed to prepare an EIS. Dkt. no. 1.
*235 For the most part, plaintiff was right. At the time construction began on the Clearfield County facility, the Bureau's compliance with NEPA was lacking. First, the Bureau awarded the contract before it adequately examined the environmental effects of the Clearfield County project. For instance, it awarded the contract without receiving complete information about whether any endangered species lived on or near the site, A.R., Vol. IV, tab 13, at III-9-11, without fully examining wetlands on the proposed site, id.; see also id. Vol. IV, tab 15, without performing geotechnical testing or taking soil samples, id. Vol. IV, tabs 13 & 15, and without receiving any comments or suggestions from the EPA, the Department of Agriculture, or the Fish and Wildlife Service. Id. Second, the Bureau completely failed to consider alternative sites for the private prison. Id. Vol. IV, tab 13, at II-1. Finally, the Bureau never made its finding of no significant impact ("FONSI") available to the public before it awarded the contract to Cornell.
No doubt recognizing that it had failed to follow the letter and the spirit of NEPA, the Bureau issued a Stop Work Order on the Cornell contract on June 11, 1999. Final EA, at I-15.[6] The purpose of this Order was to allow the Bureau to re-evaluate the environmental documentation supporting the award of the contract. Dkt. no. 9, Ex. 1, ¶ 11; Final EA, at I-15. At that time, the Bureau indicated that it would conduct its re-evaluation in accordance with its regulations and the regulations of the Council on Environmental Quality ("CEQ") which implement NEPA. Dkt. no. 9, ¶ 12. The Bureau further promised that it would prepare an EA and, based on this EA, decide whether it should prepare an EIS or whether the project could go ahead based on a FONSI. Id. Finally, the Bureau noted that if it determined that "a FONSI is appropriate and that preparation of an EIS is not warranted," it would "cancel the Stop Work Order, thereby allowing resumption of the work under the contract." Id. ¶ 13.
True to its word, the Bureau began re-evaluating the environmental impact of the Cornell project in June 1999. By August, it had prepared and published a Draft EA for public consumption. A.R. Vol VIII, tab 111. In this Draft EA, the Bureau concluded that the construction of a prison on the Clearfield County site would not significantly affect the environment. Id. Vol. VIII, tab 111, Abstract. It analyzed, but rejected, other alternatives, such as cancelling the contract to Cornell and awarding it to another contractor, cancelling the contract and re-initiating the solicitation process, or abandoning the project altogether. Id. Vol. VIII, tab 111, at III-1-3. Following the publication of the Draft EA, the Bureau allowed a public comment period of thirty (30) days. Final EA, at I-5. And on September 9, 1999, it held a public hearing in Phillipsburg, Pennsylvania to discuss the contents of the Draft EA. Id.
This public comment period resulted in a number of objections to the Draft EA from members of the public, the Commonwealth of Pennsylvania, and various federal agencies.
The most vocal opposition came from members of plaintiff's organization. For example, on September 9, 1999, Mr. Chris Bungo, plaintiff's Chairman sent a lengthy letter to the Bureau commenting on the *236 inadequacy of the Draft EA. Id. at VIII, doc. no. 35, at 1. Bungo explained that, as of the submission of the Draft EA, there was no public involvement in the NEPA process. Id. "Despite numerous attempts by our group to have questions answered on this subject," Bungo wrote, "the group has been ignored and to date our questions and concerns have not been addressed." Id. Bungo then detailed the plaintiff's objections to the adequacy of the Draft EA. For one, Bungo believed that Cornell did not have the legal authority to run a private prison in Pennsylvania. Id. at VIII, doc. no. 35, at 5 & Attach. C. Second, he claimed that the Bureau performed an inadequate analysis of the environmental consequences of the proposed project. Id. at VIII, doc. no. 35, at 2. Additionally, he demanded further studies on water supply, id. at 14, transportation, id. at 15, geology, id. at 16, and aesthetics, id. at 17.
The Commonwealth of Pennsylvania also raised objections to the proposed facility. On September 2, 1999, Martin Horn, the Secretary of the Department of Corrections for the Commonwealth, expressed his concerns with the Draft EA. In particular, he explained that "a single, free-standing correctional facility is hardly ever equipped to handle prison disturbances such as riots and escapes, let alone natural disasters." Id. at VIII, doc. no. 5. Secretary Horn also commented that such a correctional facility was illegal under Pennsylvania law. Id. "[T]here is no provision under PA law for such a correctional institution to hold individuals from outside the Commonwealth of Pennsylvania against their will," he explained. "Only institutions authorized by the General Assembly to act as correctional institutions ... may operate as prisons." Id. Pennsylvania Attorney General Mike Fisher also expressed his view that private prisons were illegal in Pennsylvania. Id. at VIII, doc. no. 35, Attach. C.
Finally, the EPA raised serious concerns about the adequacy of the Draft EA. Id. VIII, doc. no. 26. In a September 17, 1999 letter to the Bureau, Richard Pepino, the Director of the Office of Environmental Programs at the EPA succinctly stated the following: "[w]e believe that the process that has been pursued by the Bureau for this project is seriously deficient." Id. For one, Pepino noted that the Bureau had not acted in the spirit of "full disclosure" throughout the awarding and implementation of its contract. Id. Phone calls and letters from the EPA requesting information about the Clearfield County facility routinely went unanswered. Id. Second, Pepino stated that "[i]f construction of the prison was ... commenced in Philipsburg, then this fact alone renders the Draft EA very seriously flawed. Such action represents a significant commitment of resources by your agency and casts the alternatives analysis in an entirely different light...." Id. Third, the EPA noted that the Draft EA did "not demonstrate NEPA compliance with the initial award of the contract.... The obvious implication here is that the Clearfield County site was already selected before release of this Draft EA, and therefore selected in the absence of NEPA compliance." Id. Finally, the EPA stated its opinion that a FONSI was inappropriate in this case and it recommended that the Bureau withdraw its Draft EA and issue a Draft Environmental Impact Statement. Id. The EPA reiterated these concerns in a letter that it wrote to the Bureau on December 16, 1999. Id. VIII, doc. no. 40.
After considering the public comments on its Draft EA, the Bureau issued a Final EA and a FONSI on March 21, 2000. *237 FONSI, at 1-2.[7] This Final EA addressed most of the environmental concerns raised during the public comment period. For instance, it discussed topography, geology, soils, hydrology, biological resources, cultural resources, hazardous substances, aesthetics, community services, land use, utilities, transportation, noise, and air quality. Final EA, at III-IV. It also discussed various alternatives to proceeding with the Clearfield County facility, including abandoning the project altogether or beginning the bidding process all over again. Id. at II.
The Bureau again set aside a thirty (30) day period for public comments, FONSI, at 1-2, and as expected, it received a number of objections to the project. Plaintiff objected to the Bureau's Final EA and claimed that further study was needed before the project could proceed. A.R. Vol. X, tab 125. And the EPA renewed its objections to the Bureau's NEPA compliance, id. Vol. XI, tab 127, explaining that the Bureau had not followed the procedural requirements of NEPA and that the consideration of alternatives contained in the Final EA was inadequate. Id.
After taking these and other public comments into consideration, the Bureau decided to go ahead with the Clearfield County project. On August 7, 2000, it issued a Record of Decision ("ROD") in order to implement its decision to proceed with the contract awarded to Cornell. Id. Vol. XI, tab 138. According to the ROD, the Bureau had determined that lifting the Stop Work Order "does not significantly affect endangered species, cultural resources, air quality, traffic, noise, land use or the quality of the human environment and therefore, an Environmental Impact Statement will not be prepared." Id. Vol. XI, tab 138, at 5. Despite its FONSI, and the ROD implementing that decision, to date, the Bureau has not lifted its Stop Work Order and work on the project has not resumed. Dkt. no. 67, at 20.
Apparently still not satisfied, plaintiff filed an Amended Complaint in September 2000, reasserting the allegations in its original Complaint and adding a few more. Dkt. no. 45. Once again, it sought an order enjoining the Bureau from proceeding with the Clearfield County project until it prepared an adequate EIS. Id. at 43-45. After the Bureau filed the Complete Administrative Record concerning its decision to build the Clearfield County facility, the parties filed cross-motions for summary judgment. Dkt. nos. 58 & 66. It is these summary judgment motions that are before me today.

II
Although the legal questions posed by this case are complex, the statutory framework is simple. NEPA sets forth a "broad national commitment to protecting and promoting environmental quality." Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 348, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989) (citing 42 U.S.C. § 4331).[8] Prior to NEPA's passage, "environmental considerations were systematically underrepresented in the federal *238 agency decision-making process." North Buckhead Civic Ass'n v. Skinner, 903 F.2d 1533, 1539-40 (11th Cir.1990). Accordingly, to ensure that environmental considerations become a part of agency decision-making, NEPA places certain procedural duties upon federal agencies. First, it requires agencies to take a "`hard look' at [the] environmental consequences" of their actions, Kleppe v. Sierra Club, 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976) (citation omitted), so "that environmental concerns are integrated into the very process of agency decision-making." Morris County Trust for Historic Preservation v. Pierce, 714 F.2d 271, 274-75 (3d Cir.1983) (citing Andrus v. Sierra Club, 442 U.S. 347, 350, 99 S.Ct. 2335, 60 L.Ed.2d 943 (1979)). Second, it requires agencies to inform the public of the environmental consequences of their decisions, Limerick Ecology Action v. U.S. NRC, 869 F.2d 719, 725 (3d Cir.1989), thereby guaranteeing that the public is involved in and aware of agency processes. Id.; see also State of New Jersey Dep't of Envtl. Prot. v. Long Island, 30 F.3d 403, 409 (3d Cir. 1994) (noting that NEPA assures that agencies consider environmental impacts and make this information available to the public); Concerned Citizens Alliance v. Slater, 176 F.3d 686, 705 (3d Cir.1999) (same).
NEPA is essentially a procedural statute. While NEPA's procedural requirements are specific and important, the statute "itself does not mandate particular results." Robertson, 490 U.S. at 350, 109 S.Ct. 1835; Concerned Citizens Alliance, 176 F.3d at 705 ("NEPA exists to ensure a process, not to ensure any result") (citation omitted).
If the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs.... Other statutes may impose substantive environmental obligations on federal agencies, but NEPA merely prohibits uninformedrather than unwiseagency action.
Robertson, 490 U.S. at 350-51, 109 S.Ct. 1835. Stated another way, "an environmental review under NEPA does not necessarily dictate any substantive outcome: the statute is merely intended to make decision makers aware of the potential environmental ramifications of their actions." Morris County Trust, 714 F.2d at 274-75.
The "heart and soul" of NEPA's procedural requirements is the environmental impact statement or EIS. Id. at 274. Under the terms of the Act, all federal agencies must prepare an EIS for major federal actions "significantly affecting the quality of the human environment...." 42 U.S.C. § 4332(C).[9] The EIS "`insures the integrity of the agency process by forcing it to face those stubborn, difficult-to-answer objections without ignoring them or sweeping them under the rug' and serves as an `environmental full disclosure law so that the public can weigh a project's benefits against its environmental costs.'" National Audubon Society v. Hoffman, 132 F.3d 7, 12 (2d Cir.1997) (citation omitted).
In the present case, the Bureau did not prepare an EIS when it awarded the contract *239 to Cornell in April of 1999 or when it decided to lift the Stop Work Order in March 2000. Instead, in both instances, the agency prepared an environmental assessment or EA. The regulations implementing NEPA state that an EA is "a concise public document ... that serves to: (1) Briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact; (2) Aid an agency's compliance with the Act when no [EIS] is necessary; and (3) Facilitate preparation of a[n][EIS] when one is necessary." 40 C.F.R. § 1508.9(a).[10] As this definition alone demonstrates, the EA and the EIS play different roles in the NEPA framework. An EA is a prelude to an EIS and it examines a proposed project solely to help the agency decide whether to prepare an EIS. See 40 C.F.R. §§ 1501.4(b) & (c), 1508.9(a). After the EA is complete, it can be used by the agency to either "[f]acilitate preparation of (an EIS) when one is necessary," id. § 1508.9(a)(3), or help the agency prepare a finding of no significant impact, id. § 1508.13, if the agency determines on the basis of the EA not to prepare an EIS. Id. § 1501.4(e).
Plaintiff challenges the Bureau's NEPA compliance on three (3) fronts. First, it argues that the agency failed to comply with NEPA when it awarded the contract in question to Cornell in April 1999. Second, it contends that the Bureau failed to "cure" its initial violation even though it stopped work on the project and prepared a Final EA in March 2000. Finally, it claims that the Final EA is wholly inadequate because the Clearfield County project will have a significant effect on the quality of the human environment. See 42 U.S.C. § 4332(C). Plaintiff urges this Court to remand this matter to the agency for the preparation of an EIS. Both parties have filed summary judgment motions addressing these issues.
Summary judgment is a proper vehicle for resolving these questions. Summary judgment is appropriate where admissible evidence fails to demonstrate a genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). Often, there are no "genuine disputes of material fact" in cases such as the present one because the facts at issue are confined to the Administrative Record before the Court. Clairton Sportsmen's Club v. Pennsylvania Turnpike Authority, 882 F.Supp. 455, 463 (W.D.Pa.1995) (Cindrich, J.). "Instead, the disputes lie in the legal issues of whether and to what extent the [a]genc[y] complied with the procedural requirements of NEPA...." Id.; see also James Madison Ltd. v. Ludwig, 82 F.3d 1085, 1096 (D.C.Cir.1996) (district courts reviewing agency action generally do not resolve factual issues, "but operate instead as appellate courts resolving legal questions").
In resolving the dispute before me, however, three (3) general principles must act as my guide. First, review of an agency's decision under the Administrative Procedure Act ("APA") is limited to "the whole record or those parts of it cited by a party." 5 U.S.C. § 706. This section refers to the administrative record before the agency at the time it made its decision. Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 419-20, 91 S.Ct. 814, *240 28 L.Ed.2d 136 (1971), overruled on other grounds Califano v. Sanders, 430 U.S. 99, 105, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977). The Supreme Court has repeatedly stated that "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." Camp v. Pitts, 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973). In cases where the agency certifies that the Administrative Record is full and complete, the "court assumes that the agency properly designated the Administrative Record absent clear evidence to the contrary." Ammex, Inc. v. United States, 62 F.Supp.2d 1148, 1156 (C.I.T.1999) (quoting Bar MK Ranches v. Yuetter, 994 F.2d 735, 740 (10th Cir.1993)). In the instant case, the Bureau has filed an Administrative Record that includes all the documents considered by it in making its decision to proceed with the Clearfield County project without preparing an EIS. In addition, the Bureau has certified that the record in this case is true and complete. Dkt. no. 48, ¶ 8. Accordingly, my inquiry will be limited to the Administrative Record before the Bureau at the time it made its decisions, first to award the contract in question and then later to proceed with the project.[11]
Second, in reviewing the Bureau's decision, I must apply the familiar arbitrary and capricious standard from the APA, 5 U.S.C. § 706(2)(A). Society Hill Towers, 210 F.3d at 178.[12] On the one hand, this standard is meaningful: a district court must conduct a searching and careful inquiry into the record of the case. Overton Park, 401 U.S. at 416, 91 S.Ct. 814. The court must determine whether the agency's decision was "based on a consideration of the relevant factors and whether there has been a clear error of judgment." Society Hill Towers, 210 F.3d at 178 (quoting Overton Park, 401 U.S. at 415-17, 91 S.Ct. 814). On the other hand, the arbitrary and capricious standard is deferential and narrow. "The court is not empowered to substitute its judgment for that of the agency." Id. (quoting Overton Park, 401 U.S. at 415-17, 91 S.Ct. 814). Once the district court is satisfied that an agency's exercise of discretion is truly informed, "[it] must defer to `th[at] informed discretion.'" Marsh, 490 U.S. at 377, 109 S.Ct. 1851 (quoting Kleppe, 427 U.S. at 412, 96 S.Ct. 2718).
*241 Finally, the plaintiff has the burden to establish that the agency's decision violated NEPA. Lower Alloways Creek, 687 F.2d at 747. This responsibility "cannot be discharged merely by baldly asserting, without supporting proof or evidence, that significant effects will accompany a proposed action." Id. Rather, the plaintiff must "advance specific allegations tending to indicate that the agency somehow misapplied the law, misinterpreted the evidence, overlooked certain testimony, or [improperly] reached its `no significant impact' determination." Id.[13] Only if plaintiff can show a "`substantial possibility' with sufficient clarity [that] the agency's decision ... violates NEPA" will an agency's decision be overturned. Sierra Club v. Marsh, 769 F.2d 868, 870 (1st Cir.1985) (Breyer, J.).[14]

III
Plaintiff first claims that the Bureau violated NEPA when it awarded the contract to Cornell in April 1999. Defendants do not dispute this. In fact, they concede that the Bureau's "initial oversight in awarding the contract prior to the finalization of its NEPA process was a technical violation of NEPA." Dkt. no. 67, at 17. Nevertheless, in an effort to minimize the impact of this initial violation, defendants cite Vermont Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 558, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978), in which the Supreme Court explained that "a single alleged oversight on a peripheral issue, ... must not be the basis for overturning a decision properly made after an otherwise exhaustive proceeding." While I agree *242 that the Bureau violated NEPA, I disagree with defendants' characterization of this initial violation. The Bureau's initial NEPA infraction was more than just an "oversight on a peripheral issue." Id. It was a significant violation of both the letter and the spirit of NEPA. By awarding the contract in question to Cornell in April 1999 and commencing construction on the new prison before completing the NEPA process, the Bureau violated NEPA's most basic requirements in two (2) ways.

A
First, it failed to take a "`hard look' at [the] environmental consequences" of the prison project, Kleppe, 427 U.S. at 410 n. 21, 96 S.Ct. 2718 (citation omitted), before deciding to award the contract. Perhaps the most basic NEPA requirement is one of timing: agencies must take the environmental consequences of their proposed actions into account before they commit to a project. 40 C.F.R. § 1501.2 (requiring that "[a]gencies ... integrate the NEPA process with other planning at the earliest possible time to insure that planning and decisions reflect environmental values ...."); see also Susquehanna Valley Alliance v. Three Mile Island Nuclear Reactor, 619 F.2d 231, 241 (3d Cir. 1980) (explaining that the timing issue "is a real one especially when private parties are permitted by a federal agency to make major construction expenditures in advance of consideration of environmental issues"). As the Supreme Court has explained, "by focusing the agency's attention on the environmental consequences of a proposed project, NEPA ensures that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast." Robertson, 490 U.S. at 349, 109 S.Ct. 1835. Put another way, agencies must prepare NEPA documents, such as an EA, before making a commitment to a project. Metcalf v. Daley, 214 F.3d 1135, 1143 (9th Cir.2000); Concerned Citizens of Bushkill Township v. Costle, 592 F.2d 164, 170 (3d Cir.1979). Failure to do so is a violation of NEPA. Metcalf, 214 F.3d at 1143.
The Administrative Record in this case leaves no doubt that the Bureau failed to fully consider environmental issues before it committed to the Clearfield County project. The Bureau's most obvious failing is that it awarded the contract to Cornell and permitted construction on the project to commence before it had ever issued a Final EA or a FONSI. Id. at 1145 (holding that agency violated NEPA when it made a "firm commitment before preparing an EA"); Save the Yaak Comm. v. Block, 840 F.2d 714, 717 (9th Cir.1988) ("An assessment must be `prepared early enough so that it can serve practically as an important contribution to the decision-making process and will not be used to rationalize or justify decisions already made.'") (citation omitted). This oversight, however, merely underscores a more important point: as of April 1999, at least, the Bureau's NEPA analysis was woefully lacking. For instance, the Bureau awarded the contract to Cornell: 1) before it received a response from the United States Fish and Wildlife Service ("FWS") about whether any endangered species lived on or near the site, A.R. Vol. IV, tab 13, at III-9[15]; 2) before it thoroughly analyzed wetlands on the proposed site, *243 id.; id. Vol. IV, tab 15; id. Vol. VII, tab 110(c), at 5; 3) before it performed geotechnical testing knowing that the site was formerly used as a strip mine, id. Vol. IV, tab 15; id. Vol. VII, tab 110(c), at 18; 4) before it took soil samples on the proposed site knowing that the site had been used for sludge nutrient recycling, id. Vol. IV, tab 13, at IV-6; id. Vol. IV, tab 15; 5) before conducting a full scale traffic impact study, id. Vol. IV, tab 16; and 6) before receiving any comments or suggestions from the EPA, Final EA, VIII, doc. no. 26, at 1, the Department of Agriculture, or the FWS. A.R. Vol. IV, tab 13, at III-9; id. Vol. IV, tab 15.[16]
As further evidence that the Bureau did not take the requisite "hard look," the agency failed to consider any alternatives to the Clearfield County site before awarding the contract in question and allowing construction to commence. Id. Vol. IV, tab 13, at II-1. Under NEPA, all federal agencies must "[s]tudy, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative sites." 42 U.S.C. § 4332(2)(E). The CEQ and Bureau regulations implementing this provision also require that federal agencies discuss alternatives in any EA that they prepare. 40 C.F.R § 1508.9(b); 28 C.F.R. § 61.6(c). For example, the Department of Justice regulations, which bind the Bureau, 28 C.F.R. § 61.3, state that the Bureau shall "[c]onsider those alternatives encompassed by the range of alternatives discussed when evaluating proposals for Department action...." Id. § 61.6(c).
But what kind of alternatives must be discussed in an EA like the draft prepared by the Bureau in April 1999? The Supreme Court has explained that the range of alternatives considered by an agency is "bounded by some notion of feasibility." Vermont Yankee, 435 U.S. at 551, 98 S.Ct. 1197. The consideration of alternatives is controlled by the "`rule of reason,' which governs both `which alternatives the agency must discuss' and `the extent to which it must discuss them.'" Tongass Conservation Society v. Cheney, 924 F.2d 1137, 1140 (D.C.Cir.1991) (Ginsburg, J.) (quoting Natural Resources Defense Council, Inc. v. Hodel, 865 F.2d 288, 294 (D.C.Cir.1988)). Accordingly, agencies do not have to consider "alternatives that are `remote and speculative,' but may deal with circumstances `as they exist and are likely to exist.'" Natural Resources, 865 F.2d at 295 (citations omitted). A "proposed alternative is reasonable only if it will bring about the ends of the federal action." Citizens Against Burlington, Inc. v. Busey, 938 F.2d 190, 195 (D.C.Cir.1991) (Thomas, J.). Put another way, "where the agency has examined a breadth of alternatives but has excluded from consideration alternatives that would not meet the goals of the project, the agency has satisfied NEPA." Concerned Citizens Alliance, 176 F.3d at 706.
While the alternatives analysis in an EA need not be rigorous,[17] it must be *244 more than is contained in the April 1999 Draft EA. What is most troubling about the Bureau's discussion of alternatives in its Draft EA is that there is no discussion at all. In fact, nowhere does the Bureau point to and discuss any alternative sites in this document. Instead, it merely refers to the Clearfield County site as the "preferred alternative" and discusses the potential environmental impact of that project alone. A.R. Vol. IV, tab 13, II-1. This does not mean that no alternatives to the Clearfield County site existed at the time. To the contrary, the document acknowledges that there are other sites that "constitute reasonable alternatives," id., yet nowhere does the Draft EA discuss these other alternative sites. Indeed, the Administrative Record demonstrates that other reasonable alternatives existed at the time the initial contract was awarded in April 1999 and that some environmental analysis had been performed on these sites. A.R. Vol. IV, tab 14; id. Vol. VII, tab 110(b); id. Vol. X, tab 125, at 2-3 & Attach. H. Clearly, the Bureau's failure to adopt these alternatives to its proposed site would not violate NEPA. Society Hill Towers, 210 F.3d at 183. But an acknowledgment that other alternatives existed and were "reasonable" and then a blatant failure to address these alternatives, constitutes a clear disregard for NEPA's requirements. 42 U.S.C. § 4332(2)(E); 40 C.F.R. § 1508.9(b); 28 C.F.R. § 61.6(c).
In failing to prepare a Final EA or FONSI, Metcalf, 214 F.3d at 1143-45, in failing to adequately consider environmental issues, Protect Key West, Inc. v. Cheney, 795 F.Supp. 1552, 1559-60 (S.D.Fla. 1992), and in refusing to analyze alternative sites that it considered "reasonable," 42 U.S.C. § 4332(2)(E); 40 C.F.R. § 1508.9(b); 28 C.F.R. § 61.6(c), the Bureau violated the letter and the spirit of NEPA when it awarded the contract in question to Cornell and allowed construction on the project to commence. NEPA's procedures are meant to focus agency attention on "the environmental consequences of a proposed project," before "resources have been committed or the die otherwise cast." Robertson, 490 U.S. at 349, 109 S.Ct. 1835. The unique facts of this case demonstrate why compliance with these procedures is so vitally important. The Bureau decided to award the contract to Cornell before performing two (2) crucial pieces of environmental investigation: a geotechnical study; and a study of soil samples. In each instance, the Bureau conducted the relevant studies only after it awarded the contract and, in one case, only after construction on the project began. In each instance, the relevant studies uncovered potential environmental problems with the proposed site. Had the Bureau been thoroughly aware of these problems ahead of time, it might have altered its decision not to prepare an EIS, or perhaps even decided to forego the project altogether. Unaware of these issues, however, the agency moved ahead, blind to the potential environmental consequences of its action. This result is precisely what NEPA was meant to prevent. Id.
*245 First, the agency never performed a geotechnical study until after the contract was awarded and, then, only days before construction began. Final EA, App. K. The purpose of the study was to examine the effect that past mining activity would have on the proposed site during and after construction. A.R. Vol. IV, tab 15. Completed more than six (6) weeks after the award of the contract, the study concluded that "there is a strong possibility for mine subsidence in the Women's Facility area and the northwest area of the Men's Facility/YRA." Id. at 3. In particular, the study noted that a number of Coal Seams found under the proposed site were within the range where "[m]ine subsidence can occur on open ground, [and] no structures need be present. If subsidence has not already occurred, there is a very high potential of subsidence with the addition of any structures." Id. at Mine Subsidence Criteria (emphasis added). With regard to these areas, the study concluded that such areas "must be investigated" and that they "demand[] detailed study before construction." Id. After becoming aware of the great potential for subsidence, the Bureau concluded that implementation of sound building practices was the only measure needed to mitigate the risk. Final EA, at IV-5.
Second, the agency never took adequate soil samples of the proposed site until after the contract had been awarded and construction had commenced. When the contract was awarded in April 1999, the Bureau had not yet conducted soil samples on the proposed site. A.R. Vol. IV, tab 13, at III-11; id. Vol. IV, tab 15. Later studies, however, showed that portions of the site had arsenic concentrations that exceeded the applicable Pennsylvania health standard. Final EA, at III-30. On June 8, 1999, nearly two (2) weeks after construction on the new facility had begun, Cornell's Vice-President Martin H. Wiebe recommended that further testing on the arsenic be done to determine whether the arsenic concentration was within the normal limits of soil in the Eastern United States. A.R. Vol. IV, tab 16. Later testing done by both the Bureau, Final EA, at III-30, the Pennsylvania DEP, A.R. Vol. XI, tab 136, and the EPA, id, confirmed that the arsenic at the Clearfield County site was within the range of naturally occurring levels of arsenic in the Eastern United States. Id.
The problem with the Bureau's handling of both examples was not the ultimate result; it was the process itself. In both cases, the Bureau moved ahead with the project knowing full well that further study was needed, id. Vol. IV, tab 13, at III 11; id. Vol. IV, tab 15, but without informing itself of the extent of the environmental hazards posed by the proposed project. In one case, the Bureau even permitted construction on the facility to begin without knowing whether the arsenic threat was a serious one or not. Id. Vol. IV, tab 16. When he was on the First Circuit Court of Appeals, Justice Stephen Breyer succinctly described NEPA's purpose as follows:
NEPA is designed to influence the decision-making process; its aim is to make government officials notice environmental considerations and take them into account. Thus, when a decision to which NEPA obligations attach is made without the informed environmental considerations that NEPA requires, the harm that NEPA intends to prevent has been suffered....
It is appropriate for the courts to recognize this type of injury in a NEPA case, for it reflects the very theory upon which NEPA is based-a theory aimed at presenting government decision-makers with relevant environmental data before *246 they commit themselves to a course of action.
Sierra Club v. Marsh, 872 F.2d 497, 500 (1st Cir.1989) (quoting Commonwealth of Massachusetts v. Watt, 716 F.2d 946, 952 (1st Cir.1983)). Whether the Bureau's decision to award the contract in April 1999 was correct is not a matter that I am empowered to decide. Nonetheless, it is clear from the Administrative Record that it was an uninformed decision-a decision made with complete disregard for the potential environmental risks that the project might pose. Sierra Club, 872 F.2d at 500 (noting that the harm protected by NEPA is "the added risk to the environment that takes place when governmental decision-makers make up their minds without having before them an analysis (with prior public comment) of the likely effects of their decision upon the environment"). Under NEPA, such uneducated decisions cannot stand.

B
Second, the Bureau also violated NEPA in April 1999 when it failed to make a FONSI available for public review and comment before committing to the project. The CEQ regulations provide in relevant part:
In certain limited circumstances ... the agency shall make the finding of no significant impact available for public review ... for thirty days before the agency makes its final determination whether to prepare an environmental impact statement and before the action may begin. The circumstances are:
(i) The proposed action is, or is closely similar to, one which normally requires the preparation of an environmental impact statement under the procedures adopted by the agency pursuant to § 1507.3, or
(ii) The nature of the proposed action is one without precedent.
40 C.F.R. § 1501.4(e)(2) (emphasis added). Pursuant to these CEQ regulations, the Bureau has set forth a number of projects that normally require the preparation of an EIS. Of particular importance to the present case, the Bureau has placed "[n]ew Federal correctional institution construction projects" within this category. 28 C.F.R. pt. 61, App. A, § 8(1). When placed side by side, the logical result of the CEQ and Bureau regulations is the following: the Bureau was required to make a FONSI available for public review before it decided to award the contract in question to Cornell. Having failed to do so, it violated NEPA. 40 C.F.R. § 1501.4(e)(2).
The defendants claim that these provisions simply do not apply because the Clearfield County project is not one that "normally requires the preparation of an [EIS]." Id. This argument is based on two (2) theories. First, the Clearfield County project is not a "Federal correctional institution ... project[]," 28 C.F.R. pt. 61, App. A, § 8(1), because it is being built by a private contractor, not the Bureau itself. Second, the contract with Cornell is not a "construction project[]," id., because it is for the housing of inmates and says nothing about the construction of a prison. As defendants explain, Cornell must build a new facility to comply with its contract, but it is by no means required to do so.
I flatly reject defendants' argument and conclude that the Clearfield County project falls well within the Bureau's definition of a project that "normally requires the preparation of an [EIS]." 40 C.F.R. § 1501.4(e)(2). For one, if the Bureau can shed its obligations under NEPA by giving major federal projects to private contractors, NEPA's requirements would ring hollow indeed. Cf. NAACP v. Medical Ctr., Inc., 584 F.2d 619, 630 (3d Cir.1978) (noting *247 that when an agency supports a project by contract, grant, loan, or other financial assistance there is a federal action under NEPA). There is neither a difference in kind nor degree between a prison built by the federal government and one built by a private entity at the behest of the federal government, at least with regard to the environmental effects of the project. Second, the Bureau knew when it granted Cornell the contract in question that Cornell planned to build a new facility. Try as it may to distance itself from the construction of the new prison, the Bureau has controlled the process from the start. Without the federal contract, Cornell would never have planned to build the facility. Further, the Bureau had enough control over the project to successfully order the stop to all construction in June of 1999. What all this means is that the construction of the Clearfield County prison is indeed a "[n]ew Federal correctional institution construction project[]" under the Bureau's own regulations, 28 C.F.R. pt. 61, App. A, § 8(1), and it is a project for which an EIS is "normally required." Id.; 40 C.F.R. § 1501.4(e)(2).[18] Accordingly, the Bureau had to make a FONSI available for public review before awarding the contract and beginning construction. 40 C.F.R. § 1501.4(e)(2); Society Hill Towers, 210 F.3d at 174.
This violation of the letter of NEPA merely underscores the Bureau's repeated failure to make information available to the public prior to awarding the contract in the present case. The Administrative Record contains no evidence that a proposed EA was distributed or that environmental issues were even discussed with the public prior to the award of the contract and commencement of construction. In fact, the record shows just the opposite. Citizens from the Clearfield County area were not made a part of the Bureau's NEPA process until after the contract was awarded. See, e.g., Final EA, VIII, doc. no. 35, at 1. Even the EPA was unaware of the project until May 1999. Id. VIII, doc. no. 26, at 1. Obviously, such conduct files in the face of the CEQ regulations which provide that "NEPA procedures must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken." 40 C.F.R. § 1500.1(b).

C
Lest the Bureau's NEPA violation be thought of as merely technical, I note how this violation manifested itself in extremely tangible ways. For more than two (2) weeks, site preparation and construction on the new facility proceeded at the Clearfield County site absent NEPA compliance. This construction had two (2) very real effects. First, it transformed the natural environment on part of the proposed site. A.R., Vol. XI, tab 128. Vegetation, grass, and trees were leveled, and ground was plowed and flattened to make way for the new facility. Id.[19] One need only look *248 at the pictures of the site in the Administrative Record to witness the work that was done before the Bureau tried to comply with NEPA. Id. What was once open meadow, sparsely covered with wooded sections, now is just another construction site, comprised of flattened earth and numerous vehicles, without a tree in view. Second, noise, traffic, air borne dust, and other construction annoyances pervaded the area around the site day and night for more than two (2) weeks. Id. Vol. XI, tabs 129-131. While these annoyances might seem insignificant when viewed from a distance, they were certainly significant to those who lived around the Clearfield County site. Id. At a minimum, they might have been avoided, or at least mitigated, had the agency finished its NEPA compliance before permitting construction on the facility to commence.
As defendants themselves have admitted, the Bureau violated NEPA when it awarded the contract in April 1999 and permitted construction to get underway. It failed to take a "`hard look' at [the] environmental consequences" of its action, Kleppe, 427 U.S. at 410 n. 21, 96 S.Ct. 2718 (citation omitted), before committing to the Clearfield County project. And it failed to adequately inform the public of the environmental consequences of its decision, Limerick Ecology 869 F.2d at 725. The result was a procedural violation with serious, long-term effects.

IV
The defendants seek to minimize the impact of their initial violation by arguing that this violation was "cured" when the Bureau stopped all work on the project and prepared a Final EA. Dkt. no. 67, at 16.[20] In particular, defendants argue that, after the initial violation in the Spring of 1999, the Bureau undertook its NEPA analysis objectively, in good faith, and in complete compliance with the requirements of the Act. Two (2) related questions are posed by defendants argument. First, does NEPA allow an agency to cure an initial violation? And, if so, did the Bureau do so in the present case? For the following reasons, I conclude that cure is possible under NEPA and that the Bureau did effect such a cure in the present case.

A
Very few cases have addressed whether a defendant can cure an initial violation under NEPA. This shortage of case law, however, does not mean that this is a question of first impression. Indeed, NEPA's thirty-plus year history assumes that federal agencies can cure initial violations. Time and again, courts have remanded cases to federal agencies for reevaluation of environmental factors either because an agency completely failed to consider NEPA and its requirements, or because an agency's NEPA analysis was inadequate. See, e.g., Natural Resources Defense Council v. Callaway, 524 F.2d 79, 94-95 (2d Cir.1975). In such cases, the federal courts usually give the agency an opportunity to remedy its initial violation. Id. at 95 (enjoining project and remanding case so that deficiencies in EIS can be *249 remedied); Richland Park Homeowners Assoc., Inc. v. Pierce, 671 F.2d 935, 941 (5th Cir.1982) (explaining that the normal remedy for a NEPA violation is to enjoin the project and maintain the status quo until the agency has complied with NEPA's procedures); Clairton Sportsmen's Club, 882 F.Supp. at 464 (explaining that when the court finds a NEPA violation, "[t]he proper course ... is to remand to the agency for additional investigation or explanation") (citation omitted). More than anything else, this history suggests that agencies, almost uniformly, do get a second chance under NEPA.
Two common examples prove the point. First, agencies are regularly permitted to prepare supplemental environmental documents, even after they have already committed to a project. Marsh, 490 U.S. at 370-73, 109 S.Ct. 1851. NEPA imposes on federal agencies a continuing obligation to supplement existing EAs and EISs in response to "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1)(ii); Idaho Sporting Congress v. Thomas, 137 F.3d 1146, 1152 (9th Cir.1998) (holding that the standard for supplementing an EA is the same as for an EIS). Although based on new information, supplemental EAs and EISs are often used to correct "lapse[s]" in the original NEPA documents prepared by the agency. Cf. Idaho Sporting Congress, Inc. v. Alexander, 222 F.3d 562, 567 (9th Cir.2000). The provisions of the Act allowing supplemental documentation demonstrate that neither agencies nor information are perfect and, at times, corrections and reevaluations are needed. See Township of Springfield v. Lewis, 702 F.2d 426, 439 (3d Cir.1983) (Becker, J.) (noting that requiring "perfection under NEPA fails to recognize the reality that new and better information may become available.") (internal quotations and citation omitted). Indeed, "[i]t would be incongruous ... with the Act's manifest concern with preventing uninformed action, for the blinders to adverse environmental effects ... to be restored prior to the completion of agency action simply because the relevant proposal has received initial approval." Marsh, 490 U.S. at 371, 109 S.Ct. 1851.
Second, agencies are routinely given a chance to comply with NEPA even after a court has held that they have violated the Act. A typical case is the Second Circuit's opinion in Callaway. In that case, plaintiffs brought a suit under NEPA in which they sought to enjoin the United States Navy from continuing to dump "highly polluted dredged spoil at the New London Dumping Site in the Long Island Sound." Callaway, 524 F.2d at 81. The Second Circuit concluded that the Navy's EIS did not comply with the provisions of NEPA, and it enjoined the Navy from further dumping at the New London site. Id. at 94. Nonetheless, the Court did not forever doom the project. Instead, it noted that "[t]he Navy should not be permitted to proceed ... until ... the serious deficiencies in the EIS [have been] remedied." Id. at 94-95. The Court held that the Navy should circulate a supplemental EIS which should "make a genuine effort in a truly objective fashion to evaluate" the environmental issues posed by the project. Id. at 95. Although the Callaway Court found "serious deficiencies" in the agency's initial NEPA documents, it nonetheless assumed that ultimate compliance with NEPA was possible.
The Third Circuit's recent decision in Society Hill Towers seems to be guided by the same assumption. In that case, the City of Philadelphia, which was an applicant for a grant from the United States Department of Housing and Urban Development *250 ("HUD"), failed to hold a public hearing prior to applying for the grant, as required by HUD's regulations. Society Hill Towers, 210 F.3d at 179. Instead, the City held hearings on the project and provided an opportunity for public comment, after the EA was final. Id. Having technically violated the HUD regulations, the City withdrew its defective application, held a public hearing, and then resubmitted a "virtually identical" application. Id. at 179-80. Plaintiffs sued the City and HUD under NEPA, alleging that the public hearings were a "charade" and the project was a "`done deal' before public hearings were held." Id. at 179. The Third Circuit rejected plaintiff's argument and held that the defendants had cured their initial violation.
[N]othing in the regulations prevent an applicant from curing a procedural defect in a UDAG application by withdrawing the defective application, curing the defect, and then resubmitting the application. That is what occurred here. The initial application and earlier amendments were submitted without proper public notification and hearings. The prior amendment was withdrawn, hearings were held, and the application was then resubmitted.... Accordingly ... we can not conclude that the decision to forego an EIS was `arbitrary or capricious' or `without observance of procedure required by law' under the APA 5 U.S.C. § 706(2).
Id. at 179-80.[21]
The Third Circuit's decision in Society Hill Towers is also consistent with the rule in a number of other Circuits. For example, in two (2) cases, Sierra Club v. Lynn, and Richland Park Homeowners, the Fifth Circuit stated that "[i]nitial noncompliance [under NEPA] does not preclude eventual compliance." Richland Park Homeowners, 671 F.2d at 943; Sierra Club v. Lynn, 502 F.2d 43, 60 (5th Cir. 1974) ("[w]hile formally correct statements and technical compliance with [NEPA] and complimentary guidelines are required, an initial finding of section 102 noncompliance must not irrevocably preclude eventual compliance"). And in Upper Pecos Assoc. v. Stans, 500 F.2d 17, 19 (10th Cir.1974), the Tenth Circuit held that the Department of Commerce complied with NEPA even though it prepared an EIS after it had already awarded a grant for the construction of a new highway. In simple terms, the Court held that "NEPA does not specifically require voiding ab initio a grant offer made prior to the filing of an environmental impact statement." Id. As these and many other cases demonstrate, federal agencies get a chance to cure initial NEPA violations.
If this was the extent of the case law on cure, the answer in this case would be easy: the Bureau would be entitled to cure, and the only question before me would be whether the Bureau's Final EA complies with NEPA or whether an EIS is required. What complicates matters is that NEPA requires something more of agencies that have once run afoul of the Act. At a minimum, the Administrative Record must show that the agency made a good faith and objective effort to evaluate the relevant environmental criteria. See Callaway, 524 F.2d at 95. As the Ninth Circuit has correctly noted, an agency's NEPA analysis "must be taken objectively and in good faith, not as an exercise in form over substance, and not as a subterfuge *251 designed to rationalize a decision already made." Metcalf, 214 F.3d at 1142. And in cases where the agency has already violated NEPA, its vow of good faith and objectivity is often viewed with suspicion.
The Ninth Circuit's recent opinion in Metcalf v. Daley demonstrates the problem for agencies that have committed an initial NEPA violation. In that case, the National Oceanic and Atmospheric Administration ("NOAA") entered a written agreement with the Makah Indian Tribe under which the NOAA agreed to make a formal request to the International Whaling Commission ("IWC") that the Makah be allowed to hunt up to five (5) gray whales per year. Id. at 1139. Under a number of federal statutes and international treaties, the IWC had the authority to set quotas for the maximum number of whales to be taken in one season. Id. at 1138. The NOAA presented its request at the IWC annual meeting in June 1996, but eventually withdrew the request after learning that it did not have the necessary support. Id. at 1139. A year later, in June of 1997, NOAA received a letter from an environmental organization alleging that it had violated NEPA by authorizing and promoting the Makah whaling proposal without preparing an EA or an EIS. Id. In response, the NOAA prepared a Draft EA which it distributed for public comment on August 22, 1997. Id. Meanwhile discussions between the NOAA and the Makah proceeded apace, and on October 13, 1997, the parties entered into a new written agreement which was nearly identical to the one they had entered in 1996. Id. Four days after this new agreement was signed, the NOAA issued a Final EA and FONSI. Id. at 1140. On October 18, 1997, the NOAA returned to the IWC annual meeting where it was successful in obtaining the whaling quota for the Makah. Id.
The Ninth Circuit held that the NOAA violated NEPA when it entered the first agreement with the Makah in 1996. Id. at 1143.
The Federal Defendants did not engage in the NEPA process at the earliest possible time. Instead, the record makes clear that the Federal Defendants did not even consider the potential environmental effects of the proposed action until long after they had already committed in writing to support the Makah whaling project. The point of commitment in this case came when NOAA signed the contract with the Makah in March 1996 and then worked to effectuate the agreement. It was at this juncture that it made an irreversible and irretrievable commitment of resources. ... [T]he contracts were awarded prior to the preparation of the EAs ... These events demonstrate that the agency did not comply with NEPA's requirements concerning the timing of their environmental analysis, thereby seriously impeding the degree to which their planning and decisions could reflect environmental values.
Id. at 1143-44 (internal quotation marks and citations omitted). Apparently, this initial error was so serious that the Ninth Circuit found it "highly likely that because of the Federal Defendants' prior written commitment to the Makah and concrete efforts on their behalf, the EA was slanted in favor of finding that the Makah whaling proposal would not significantly affect the environment." Id. at 1144 (emphasis added).
While the Metcalf case represents a substantial limitation on the rule that agencies can cure previous NEPA violations, it is merely the exception that proves the rule. For instance, the case was "limited to [its] unusual facts and circumstances ..." Id. at 1145. These facts included an agency *252 that completely disregarded NEPA before it committed to a project, and that never sought to withdraw its commitment in order to reevaluate the environmental consequences of its action. Indeed, as the Ninth Circuit suggested, the case might have come out differently had the agency unilaterally withdrawn its contract with the Makah "in order to reconsider environmental considerations." Id. at 1144. Accordingly, the Metcalf Court recognized that the NOAA could have cured its initial NEPA violation, but simply did nothing to demonstrate a good faith effort to effect such a cure.
Other parts of the Metcalf decision demonstrate that the Court accepted the general rule that agencies can cure initial NEPA violations. In fact, the Court did give the NOAA a second chance by remanding the case back to the agency for reconsideration of the environmental consequences of the Makah whaling project. Id. at 1146. The Court required that, on remand, the agency's review be "an objective evaluation free from the previous taint." Id. And, rather than dictate precisely how the agency could conduct such a review, the Court left it up to the agency to "ensur[e] that the process for which we remand the case is accomplished objectively and in good faith ..." Id.
At the end of the day, then, Metcalf does not change the general rule, but it does stand as a warning to agencies who seek to cure initial NEPA violations. It says that agencies cannot use the NEPA process as "an exercise in form over substance ..." Id. at 1142. It cautions that NEPA cannot be used as a mere "subterfuge designed to rationalize a decision already made." Id. And it requires courts to scrutinize the Administrative Record to guarantee that agencies evaluate environmental considerations "objectively and in good faith," id, with the "clear-eyed hard look" that NEPA requires. Id. at 1146. In this respect, Metcalf is no different than cases like Callaway. Agencies are certainly permitted to cure NEPA violations, but they must do so in good faith. And agencies must not use their environmental documents as "a mere rubber stamp" or "post hoc rationalization of decisions already made." Callaway, 524 F.2d at 95; Upper Pecos Assoc., 500 F.2d at 19.

B
In the present case, the Bureau did undertake the kind of objective and good faith analysis that NEPA requires. First, the agency stopped all work on the contract to Cornell as soon as it determined it was violating NEPA. Dkt. no. 9. Since June of 1999, in fact, the Bureau has refused to proceed with the project until this Court determines that it has satisfied NEPA's requirements. Two (2) things are significant about this Stop Work Order, at least as far as the Bureau's objectivity and good faith are concerned. First, the Order was self-imposed, demonstrating a recognition of error and a willingness to correct it. If intransigent defendants are given a second chance to comply with NEPA, see, e.g., Callaway, 524 F.2d at 94-95; Protect Key West, 795 F.Supp. at 1564, then defendants who belatedly show good faith compliance should be given a second chance as well.
Second, under the Stop Work Order, the Bureau had the opportunity to abandon the project altogether and cancel the contract to Cornell. Dkt. no. 9, Attach 1, § 52.242-15, Stop Work Order. Even the contract itself required compliance with NEPA and, thus, could have been terminated had the agency decided that it was unable (or unwilling) to proceed with the project under NEPA. A.R. Vol. III, tab 12, at 7 (requiring compliance with "all applicable Federal, State, and local laws and regulations ..."). Accordingly, the Bureau *253 was not tied to an agreement that it could not escape. Compare Metcalf, 214 F.3d at 1144. It was free to consider the environmental consequences of the project openly and honestly without pressure from its prior mistake.[22]
The evidence shows that the Bureau did just that. Between June 1999 and March 2000, it considered a broad range of environmental issues, including many that it had inadequately explored before awarding the contract in question. And it sought to look at environmental factors with fresh eyes, uninfluenced by its previous error. A few examples will demonstrate the point.

Hydrology: When it initially awarded the contract, the Bureau had performed little analysis on the stormwater runoff resulting from construction of the new facility. A.R. Vol. IV, tab 13, at IV-3. By the Final EA, however, the Bureau had fully considered this issue, found it to be of little significance, and had devised a stormwater management system to minimize any impact from stormwater runoff to downstream properties. Final EA, at IV-10.

Hazardous Substances: When it first awarded the contract, the Bureau knew that the site had been used for wastewater sludge, but it failed to perform any further testing. A.R. Vol. IV, at IV-6. By the time it issued its Final EA, however, further testing had been performed. This testing confirmed that arsenic concentrations in parts of the site were in excess of the Pennsylvania health standard, but well within the natural background level found in the northeast. Final EA, at IV-18. Further, the agency determined how to minimize the risk, if any, posed by the arsenic. Id. at IV-20. When questions were again raised about potential arsenic contamination after completion of the Final EA and FONSI, the Bureau held off on issuing its ROD until after the Pennsylvania DEP and the EPA had tested soil samples themselves and confirmed that the arsenic posed no risk. A.R. Vol. XI, tabs 136, 138.

Geotechnical Study: As discussed earlier, the Bureau awarded the initial contract without performing any study on the impact of previous mining on the site. See supra IIIB. By the issuance of the Final EA, however, a study was performed that showed the Bureau how to build the new facility without effecting preexisting mines. Final EA, at IV-5.

Housing: When it awarded the contract, the Bureau had performed a cursory review of the effects that the new facility would have on housing in the area. A.R. Vol. IV, tab 13, at IV-9. By its Final EA, the Bureau had thoroughly analyzed the issue, comparing the number of new residents in the area as a result of the project with the number of vacant housing units. Final EA, at IV-29. The Bureau concluded that the project would not have a significant effect on housing in the area, other than to slightly boost the market.

Community Services: Before awarding the contract, the Bureau had not adequately analyzed the effect that the facility would have on law enforcement in the area. A.R. Vol. IV, tab 13, at IV-9-11. Instead, the Bureau merely noted that arrangements had to be made with local providers. Id. By the Final EA, the Bureau had conducted further study. It outlined the contingency plan adopted *254 by the new facility in the event of emergencies. Final EA, at IV-32 & App. J. And it discussed arrangements with local law enforcement to aid the facility in emergency situations. Id. at IV-32. At the end of the day, the Bureau concluded that the facility would not significantly affect community services, including fire, police, medical, and education.

Traffic: When it awarded the contract, the Bureau had not performed a traffic study of the proposed area, even though the project was likely to have some effect on traffic patterns. A.R. Vol. IV, tab 13, at IV-16. By the time it completed its Final EA, however, the Bureau had performed a detailed traffic study of the area surrounding the Clearfield County site and concluded that the facility would not significantly affect the environment. Final EA, at IV-48-50 & App. L.
These are only a few examples of the work performed by the Bureau after it issued its Stop Work Order. The Administrative Record demonstrates that many more studies were performed and environmental issues scrutinized by the Bureau. What this list demonstrates is the extent to which the Bureau sought to make an informed and objective assessment of the environmental effects of the Clearfield County project.
A final indication that the Bureau sought to evaluate the environmental impact of the project objectively and in good faith was the extent to which it allowed and considered public comment during the preparation of its Final EA. The agency received a large amount of correspondence from the public and other agencies, and it took great pains to consider the issues raised. Final EA, at VIII. In addition, the agency held a public hearing on its Draft EA in Philipsburg in September 1999, id. App. H, something that is not clearly required by NEPA. Society Hill Towers, 210 F.3d at 174. While plaintiff's members may "feel that their opposition fell on deaf ears even though they were finally able to voice it ... the record here is to the contrary." Society Hill Towers, 210 F.3d at 180. The Bureau did not ignore the concerns of those opposed to the project. Id. It listened to their objections, considered them with care, and, at times, incorporated these concerns into its Final EA. Final EA, at VIII, response to doc. no. 26; id. at VIII, response to doc. no. 40. At a minimum, this demonstrates that the Bureau undertook its NEPA analysis objectively, in good faith, and with an eye toward removing any taint from its previous violation.

C
Plaintiff disagrees with my conclusion. It argues that the Bureau's decision to select the Clearfield County site was preordained and that the Final EA was heavily slanted toward a finding of no significant impact. As proof of its theory, plaintiff seizes on statements in the Final EA and FONSI indicating that the Bureau's analysis was limited to whether it should lift the Stop Work Order on the Cornell contract. For instance, in its Final EA, the Bureau stated the following:
The purpose of this EA is to present a site-specific assessment of the environmental consequences associated with the lifting of a Stop Work Order on a contract awarded by the U.S. Department of Justice, Federal Bureau of Prisons (Bureau) to a private contractor to house inmates in a contractor-owned/contractor-operated correctional facility.
Final EA, at I-1.[23] According to plaintiff, this statement shows that: 1) the Bureau *255 never seriously reconsidered the original award of the contract to Cornell in its Final EA; and 2) that the Bureau never openly and honestly considered alternative sites to the proposed project.
I disagree with both contentions. First, a review of the entire Final EA, and not just a few statements taken out of context, demonstrates that the Bureau seriously reconsidered the original award of the contract to Cornell and even considered rescinding that contract altogether. First, the Bureau described the scope of its Final EA as follows: "the proposed action is to award a contract to a private contractor to house approximately 1,000 inmates in a contractor-owned/operated facility located within a 300-mile radius of the U.S. Capitol." Id. at I-6; see also id. at I-1 & 8 (the purpose is the "award of a contract to one or more of these private contractors to house approximately 1,000 inmates in one or more contractor-owned/operated facilities as described below"). Indeed, the Bureau routinely discussed the project in broad terms, explaining that "[t]he private contractor selected by the Bureau will be responsible for housing approximately 1,000 inmates," id. at IV-1, and not in a way that limited its analysis to just the Cornell contract. Second, in its discussion of alternatives, the Bureau repeatedly considered whether to cancel the contract to Cornell and award it to someone else. Id. at II-1-8. Finally, the agency considered the option of not doing any project at all, called the "No Action Alternative," which it defined as "a decision to terminate the current contract" with Cornell. Id. at II-1. What these statements highlight is that everything was on the table: maintaining the contract with Cornell, canceling the contract and awarding it to someone else, putting out a new solicitation for bids, and terminating the private prison project altogether. Plaintiff's claim that the Bureau did not seriously consider whether it was proper to award the contract to Cornell in the first place is simply unsupported by the Administrative Record.
Second, plaintiff's claim that the Bureau did not adequately consider alternative sites is also flatly contradicted by the Administrative Record. The Bureau considered six (6) different approaches: 1) lift the Stop Work Order on the contract awarded to Cornell and proceed with the construction of the Clearfield County site; 2) modify the contract with Cornell for a location other than Clearfield County; 3) proceed with a contract with the Corrections Corporation of America ("CCA") at a site in the District of Columbia; and 4) proceed with a contract with the Washington Development Group, Inc. ("WDG") at a site in Terra Alta, West Virginia; 5) cancel the award to Cornell and proceed with a new solicitation; and 6) cancel the contract and forego the private prison project altogether. Id. at II-1-8. After taking all environmental factors into account, the Bureau decided that its best option was to proceed with the Clearfield County project. Three (3) primary reasons were behind this decision.
First, the Bureau believed that the Clearfield County project provided the best overall value to the agency and that other options posed problems. The District of Columbia site, for instance, could only house 300 inmates, making it necessary *256 to find other housing arrangements for the 700 remaining inmates that the agency had to house. Id. at II-5. The Terra Alta site posed some serious environmental concerns. In particular, it was thought to be the home of the Indiana bat, a threatened species, it contained significant wetlands, and it contained an historic bridge that would have to be torn down. Id. at III 27, IV-14, 17. Finally, the no action alternative and the option of putting the project out for a rebid ran flatly against a deadline imposed by Congress for the housing of inmates. Id. at II-1 & 8. The Bureau's judgments seem wholly reasonable and certainly do not suggest that the Bureau did not objectively evaluate alternative sites. After all, NEPA only requires that appropriate alternatives be considered. It "does not mandate that any particular alternative be selected during an EA." Society Hill Towers, 210 F.3d at 183.
Second, the Bureau concluded that the Clearfield County project would have little effect on the environment. The Bureau was certainly entitled to reject alternative sites based on this conclusion. In fact, as numerous courts have explained, the range of alternatives that an agency must consider decreases as the impact of a project becomes less and less significant. Olmsted Citizens, 793 F.2d at 208; Sierra Club, 38 F.3d at 803; Friends of the Ompompanoosuc, 968 F.2d at 1558 (2d Cir.1992). Indeed, it would be "something of an anomaly to require that an agency search for more environmentally sound alternatives to a project which it has determined ... will have no significant environmental effects anyway." Olmsted Citizens, 793 F.2d at 208 (citation omitted).
Finally, the Bureau faced a deadline, set by Congress, to house at least 2,000 DCDC prisoners by the end of 1999. In the National Capital Revitalization and Self Government Improvement Act of 1997, Pub.L. No. 105-33, 111 Stat. 251, the United States Congress set forth the following mandate for the Bureau:
The Bureau of prisons shall house, in private contract facilities 
(a) at least 2000 District of Columbia sentenced felons by December 31, 1999; and
(b) at least 50 percent of the District of Columbia sentenced felony population by September 30, 2003.
Pub.L. No. 105-33, 111 Stat. 251, § 11201(c)(1). While this time-frame cannot be used to disregard other congressional mandates, such as NEPA, it is nonetheless important. "[A]n agency should always consider the views of Congress, expressed, to the extent that the agency can determine them, in the agency's statutory authorization to act ..." Citizens Against Burlington, 938 F.2d at 196 (Thomas, J.); cf. Izaak Walton League of Am. v. Marsh, 655 F.2d 346, 372 (D.C.Cir. 1981) ("When Congress has enacted legislation approving a specific project, the implementing agency's obligation to discuss alternatives ... is relatively narrow."). After taking its NEPA analysis into account, the Bureau was entitled to rely on this congressionally-set time-line in deciding to proceed with the Cornell contract. Doing so does not undermine the Bureau's NEPA analysis nor does it impugn the agency's good faith.
The case law cited by plaintiff also does not undermine my conclusion that the Bureau undertook its NEPA analysis in good faith and with an objective and honest consideration of environmental issues. The two (2) cases relied on by plaintiff, Susquehanna Valley and Protect Key West, are clearly distinguishable. Susquehanna Valley does not even address the issue of cure. Instead, in that case, the Third Circuit was concerned with a jurisdictional *257 issue under NEPA. Susquehanna Valley, 619 F.2d at 234. In dictum, the Court made a number of statements about when NEPA documents must be prepared, id. at 241, with which I readily agree. See supra IIIA. Nevertheless, the Court did not discuss whether the agency violated NEPA, id., let alone whether an agency can cure once it has committed an initial NEPA violation.
Protect Key West is more on point, but equally distinguishable. In that case the agency had prepared an incomplete EA which it then tried to cure through studies performed after the decision to go ahead with the project had been made. Protect Key West, 795 F.Supp. at 1560. The agency's conduct in Protect Key West was the quintessential post-hoc rationalization for a decision that was already set in stone, id. at 1562, and a far cry from the Bureau's conduct in the present case. Unlike the Bureau, the defendants in Protect Key West did not seek to withdraw their commitment to the project, they did not try to evaluate environmental factors afresh, they did not prepare a new EA, and they did not consider public comments. Just as with the other cases cited by plaintiff, though, even the Protect Key West decision proves that cure is possible under NEPA. In fact, the Court readily admitted that federal agencies get more than "`one bite at the apple' in attempting to comply with [NEPA]." Id. And it remanded the matter back to the agency "pending preparation of an Environmental Assessment in conformity with [the Act]." Id. at 1564.
Metcalf v. Daley, a case cited by neither party, may be the best case for plaintiff. Yet ultimately, it too is distinguishable for three (3) reasons. First, the agency in Metcalf was bound by its agreement with the Makah even if environmental factors showed that the project should not go forward. Metcalf, 214 F.3d at 1144. As the Ninth Circuit explained, "[h]ad [the defendants] found after signing the Agreement that allowing the Makah to resume whaling would have a significant effect on the environment, the Federal defendants ... may not have been able to fulfill their written commitment to the Tribe. As such, NOAA would have been in breach of contract." Id. Because the Metcalf defendants had no way out of their contract, the Metcalf Court found it "highly likely" that "the EA was slanted" in favor of finding that the project did not significantly affect the environment. Id. No such binding contract and, thus, no pressure toward a finding of no significant impact exists in this case. The Bureau was free to end its contract with Cornell at any time and for any reason. Indeed, the contract itself required compliance with NEPA and could be terminated if environmental factors suggested that proceeding was unwise. Thus, the Bureau could freely, openly, and objectively consider the environmental consequences of the contract to Cornell without fear that a decision against proceeding would subject it to another lawsuit-this time, for breach of contract.
Second, the agency in Metcalf never withdrew its contract with the Makah solely to reevaluate environmental issues. Id. The Ninth Circuit noted this fact and suggested that the result in its case might have been different had the agency done so. Id. (noting that agency's withdrawal of contract was due to lack of political support "not in order to reconsider environmental concerns"). Obviously, the Bureau did suspend its contract with Cornell simply to reconsider environmental issues. And it refused to permit any work on the contract to proceed until it completed its NEPA analysis and determined that the contract award was proper. At minimum, a kind of good faith effort to evaluate environmental issues exists in this case that was simply missing in Metcalf.
*258 Finally, the remedy imposed by the Metcalf Court is simply unnecessary, and even redundant, in the present case. After holding that the agency had violated NEPA, the Metcalf Court suspended the implementation of the contract, ordered the agency to begin the NEPA process afresh, and required the agency to prepare a new EA. Id. at 1146. What is remarkable about this remedy is that it requires the same conduct that the Bureau voluntarily undertook in June of 1999. For one, the Bureau suspended its contract with Cornell, and did so before it completed its Draft EA, its Final EA, or its FONSI. Second, the Bureau decided to take a fresh look at the environmental issues concerning the award of the contract to Cornell, and did so over a nine-month period between June 1999 and March 2000. Finally, the Bureau decided to prepare a new EA, and did so in March 2000. Accordingly, even if Metcalf was directly on point, the Bureau has already done all that Metcalf requires.
The better case is Society Hill Towers. Like the defendants in that case, the Bureau has cured its initial violation. It did so by stopping all work on the contract to Cornell, by reconsidering the environmental issues concerning the award of the contract, by evaluating whether to cancel the contract, award it to another party, or forego the private prison project altogether, and by honestly and objectively considering alternatives to the proposed site. See Society Hill Towers, 210 F.3d at 179-80. More than anything else, these facts show a good faith effort to comply with NEPA.

V
One issue remains: was Bureau's decision to proceed with the Clearfield County project based solely on its Final EA and FONSI proper under NEPA, or does the Act require a more elaborate environmental analysis in the form of an EIS? This is a threshold question in nearly every NEPA case, Daniel R. Mandelker, NEPA Law and Litigation § 8.01 (2d ed., 2000), and the language of the statute is the starting point in answering it. NEPA provides that an EIS must be prepared for all "proposals for ... major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). As the statutory language itself demonstrates, whether an EIS is required breaks down into two (2) separate questions: 1) is the proposed agency action a major federal action?; and 2) if so, will its environmental effects be significant? Concord Township, 625 F.2d at 1074; State of New Jersey Dep't of Env't Prot., 30 F.3d at 416 n. 23; see also Hanly v. Kleindienst, 471 F.2d 823, 830 (2d Cir. 1972). The defendants concede that the project at issue is a "major Federal action[]" within the meaning of NEPA.[24] Accordingly, the only question before me is the second one: will the Clearfield County project "significantly affect[] the quality of the human environment"? Id. § 4332(C).
*259 The statute itself provides little help in answering this question. The term "significantly" is not defined in NEPA and the Act provides no example of the kinds of projects that should normally require an EIS. Nevertheless, the regulations implementing the statute make up for this void by defining the key terms of the statute, particularly the term "significantly." See Lower Alloways Creek, 687 F.2d at 739-40 (calling "significantly" the "key word in [the] statutory phrase [significantly affecting the quality of the human environment]").[25] Under 40 C.F.R. § 1508.27, an agency is to decide whether a proposed project "significantly" affects the environment by examining the "context" and the "intensity" of its proposed action. "Context" means that an agency must consider the short- and long-term effects of its proposed action in light of the "setting of the proposed action." Id. § 1508.27(a). At times, this may require the agency to consider its action in relation to "society as a whole (human, national), the affected region, the affected interests, and the locality" at issue. Id. "Intensity" "refers to the severity of the impact" that an agency's action will have on the environment. Id. § 1508.27(b). The regulations set forth ten (10) factors that an agency must analyze when examining the intensity of its action. Id.[26]
*260 While these definitions do not tell agencies when an EIS must be prepared, they do set forth a general principle that it is important for courts to keep in mind when determining whether an agency's decision to forego an EIS should be upheld. At its root, NEPA is about guaranteeing that agency decision-making is informed with environmental considerations. Sierra Club, 872 F.2d at 500. As the Third Circuit has explained, "an agency must undertake a comprehensive assessment of the expected effects of a proposed action before it can determine whether that action is `significant' for NEPA purposes." Lower Alloways Creek, 687 F.2d at 740. It cannot "avoid its statutory responsibilities under NEPA merely by asserting that an activity it wishes to pursue will have an insignificant effect upon the environment." Id. at 741. Rather, it must supply "`convincing reasons why potential impacts are truly insignificant,' if such is [its] recommendation." Id. at 741-42 (quoting Maryland-National Park and Planning Commission v. United States Postal Service, 487 F.2d 1029, 1040 (D.C.Cir.1973)). Only by undertaking such a comprehensive review of environmental considerations, can an agency's decision truly be informed.

A
Plaintiff's first attack on the Final EA is based on an interpretation of the CEQ and Bureau regulations. In particular, plaintiff claims that these regulations require the preparation of an EIS as a matter of law in the present case. To support its argument, plaintiff raises two (2) points: first that the Bureau's own regulations state that an EIS is normally required for new construction projects; and second that under CEQ guidance, the length and complexity of the Bureau's Final EA means that an EIS is required. Neither argument carries the day and neither alters the general rule that an EIS is only required when a project "significantly affect[s] the quality of the human environment." 42 U.S.C. § 4332(C).
First, plaintiff cites the Bureau's own regulations, which state that "[n]ew Federal correctional institution construction projects" normally require an EIS. 28 C.F.R. pt. 61, App. A, § 8(1). These regulations bind the agency. Id. § 61.3; id. pt. 61, App. A, § 2. And at least one Court of Appeals has stated, albeit in dicta, that "[a]n EIS must be prepared if the proposed agency action is one which `normally requires an environmental impact statement.'" Seattle Community Council Federation v. Federal Aviation Admin., 961 F.2d 829, 832 (9th Cir.1992) (citing 40 C.F.R. § 1501.4(a)(1)).
While I admit that these regulations do apply in the present case, they by no means mandate the preparation of an EIS. For one, the regulations themselves are not mandatory. Instead, they merely provide for instances when an EIS is "normally" required. Oxford English Dictionary (2d ed., 1989), at http://dictionary.oed.com/entrance.dtl (defining "normally" as "[u]nder normal or ordinary conditions"). Obviously, if a project otherwise falling within the predefined category is "abnormal," id. (defining "abnormal" as "[d]eviating from the ordinary rule or type"), or "extraordinary," id. (defining "extraordinary" as "[o]ut of the usual or regular course or order"), no EIS would be required, even under the clear language of the regulations. More importantly, the CEQ regulations expressly recognize that even in cases where "[t]he proposed action is ... one which normally requires the preparation of an environmental impact *261 statement," 40 C.F.R. § 1501.4(e)(2)(i), the agency may, and sometimes will, draft an EA and issue a FONSI. Id. § 1501.4(e)(2).
In addition, the only case to have squarely addressed the issue has concluded that "actions which an agency determines will normally require an EIS, do not always require an EIS." Committee to Preserve Boomer Lake Park v. Department of Transportation, 4 F.3d 1543, 1555 (10th Cir.1993). In Boomer Lake Park, the plaintiff alleged that the Department of Transportation ("DOT") violated NEPA because it failed to comply with its own regulations. At issue was DOT Order 5610.1C, which stated the following: "[a]ny action having more than a minimal effect on lands protected under 4(f) of the DOT Act will normally require an environmental [impact] statement." Order 5610.1C § 12(a). The Tenth Circuit rejected plaintiff's argument that the regulation required an EIS as a matter of law. Reviewing the language of the CEQ regulations, the court concluded that an agency may prepare an EA and FONSI even when its project is one that would "normally require" an EIS. Boomer Lake Park, 4 F.3d at 1555. As the Tenth Circuit recognized, the ultimate question is whether the project in question "would necessarily have a significant effect on the human environment," not whether it was a project that "normally required" an EIS. Id.
Second, plaintiff cites the length and complexity of the Final EA to argue that an EIS must be completed as a matter of law. On the one hand, the plaintiff's argument makes sense. Standing at over 160 pages, with hundreds of pages of attached documents, diagrams, and appendices, the Final EA is no bedtime reading. Quite the contrary, it is a massive treatise on the environmental consequences of the Clear-field County project. It is certainly not a "brief" and "concise" document as the CEQ regulations require. 40 C.F.R. § 1508.9. In fact, it is significantly longer than the CEQ recommends, see Forty Most Asked Questions, 46 Fed.Reg. 18026, 18037 (1981) (calling on agencies `to limit EA's to not more than approximately 10-15 pages'), and even longer than the typical full-blown EIS, see 40 C.F.R. § 1502.7 (EIS should "normally be less than 150 pages and for proposals of unusual scope or complexity ... less than 300 pages"). The CEQ has stated:
Agencies should avoid preparing lengthy EAs except in unusual cases, where a proposal is so complex that a concise document cannot meet the goals of [CEQ regulations] and where it is extremely difficult to determine whether the proposal could have significant environmental effects. In most cases, however, a lengthy EA indicates that an EIS is needed.

Forty Most Asked Questions, 46 Fed.Reg. at 18037 (emphasis added). As Justice Breyer stated when confronting a similar situation. "To announce that these documents-despite their length and complexity-demonstrate no need for an EIS is rather like the mathematics teacher who, after filling three blackboards with equations, announces to the class, `You see, it is obvious.'" Sierra Club, 769 F.2d at 874; see also Curry v. United States Forest Service, 988 F.Supp. 541, 556 (W.D.Pa.1997) (Standish, J.) (holding that a 49 page EA with 349 pages of appendices "undermine[d] defendants' decision not to prepare an EIS").
The problem with plaintiff's argument, however, is that length and complexity tell us nothing about the ultimate question that we must answer in the present case: whether the project will have a significant effect on the environment. Indeed, just as *262 length and complexity might suggest that an EIS is required, they might also bolster the Bureau's conclusion that no EIS is required. Again, I turn to Justice Breyer's analysis of the issue:
We should not give conclusive weight, one way or the other, to the simple facts of EA length, complexity, and controversy. These facts do not by themselves show that the EA's conclusion  `no significant impact'  is correct, nor do they show it is incorrect. At most, they show the practical wisdom of CEQ's advice: the agencies would have saved time in the long run had they devoted their considerable effort to the production of an EIS, instead of the production of documents seeking to prove that an EIS is not needed....
Moreover, under NEPA and its implementing regulations, we cannot accept an EA as a substitute for an EIS  despite the time, effort, and analysis that went into their production  because an EA and an EIS serve very different purposes....
[A]t this point, we consider only the lawfulness of the agencies' finding that the project will have no significant impact on the environment. The legal issue, as we have said, is whether the record reveals that conclusion to be unreasonable, to the point where the decision not to prepare an EIS either violates NEPA or (what here comes to the same thing) is `arbitrary, capricious, an abuse of discretion.' 5 U.S.C. § 706(2)(A).
Sierra Club, 769 F.2d at 874. I adopt this reasoning and now turn to what is the ultimate issue in this case: whether the Clearfield County project will have a significant impact on the environment.

B
If one theme captures plaintiff's attack on the Final EA it is the lack of support that it has in the Administrative Record. Time and again, plaintiff fails to point to any evidence that undermines the Bureau's determination of no significant impact. And, time and again, the Bureau demonstrates that it has considered plaintiff's objections and found them to be without merit. While a review of every objection to the project is unnecessary, a brief examination of the main objections demonstrates the point.

1. Urban Sprawl
First, plaintiff claims that the Final EA does not adequately address the issue of urban sprawl. Dkt. no. 63, at 30. "The facility will have hundreds of employees, uncounted delivery and supply vehicles daily, as well as visitors and relocating family members of inmates. Undoubtedly a major transformation of [the area] will occur." Id. The question of urban sprawl is certainly one that must be considered by an agency planning a project such as the one at issue in this case. In fact, the CEQ regulations require consideration of both the direct, 40 C.F.R. § 1508.8(a), and indirect effects of a project, including "[g]rowth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems." Id. § 1508.8(b).
Unfortunately for plaintiff, the Administrative Record shows that the Bureau fully considered the issue of urban sprawl and found that the project would have little, if any, impact. Final EA, at III-30-52. For one, the Bureau determined that the project would not significantly effect the population of Clearfield or Centre counties. The Bureau explained that Cornell will need 346 employees to run the prison, 69 of these will come from other Cornell facilities *263 and relocate to the area, id. at IV-24, and an additional 87 employees will be hired from outside the area. Id. The remainder of the employees will be hired from the Clearfield and Centre county areas. All told, then, the population of the area will increase by 156 employees, id., or 407 total persons when families are added to the mix. Id. at IV-24-25.[27] When these 407 people are added to the over 200,000 who currently live in Clearfield and Centre counties, their presence will hardly alter the balance. Id. at III-34.
Nonetheless, the Bureau extensively considered the effect that these additional people will have on the housing market and local services. As for housing, the population shift will have no real effect on the community. For instance, according to the 1990 census, there were 4,492 vacant housing units within Clearfield County and 3,512 in Centre County, more than enough to accommodate the minor population influx due to the prison. Id. at IV-29. New housing, then, will hardly be needed. The population increase also will have little effect on community services. Education provides the perfect example. The Bureau considered the vacancy rates at local schools and determined that these schools were operating at rates of between 61% and 78.8% capacity. Id. at III 45. It then determined that, out of the 407 individuals who will be relocating to the area, approximately 92 will be school-aged. Id. at IV-33. Based on the vacancy rates at local schools, the Bureau reasonably concluded that the prison would not have significant effect on the schools in the area. Id. at IV-33-34.
No doubt, the existence of the prison will transform the landscape and require upgrading of roads and extension of utilities. Nonetheless, the Bureau analyzed these direct effects and concluded that they would not result in "urban sprawl." An example again will demonstrate the thoroughness of the Bureau's analysis. One of the plaintiff's main concerns when it discusses the issue of urban sprawl is the traffic. The Bureau acknowledged that traffic in the area will increase during construction and during operation of the facility. Id. at IV-48. Yet, it studied the traffic issue and concluded that the prison would not have a significant impact on the roadways and intersections in the area. Id. at IV-48 & App. L. NEPA requires no more.
But what about additional development? Once a prison is built, with accompanying utilities and upgraded roads, other businesses may want to relocate to the area, resulting in precisely the problem that plaintiff is concerned about: the transformation of a rural area into a small city, complete with industrial parks, four-lane highways, and the concomitant annoyances of urban life. I understand the issue, and so did the Bureau. But while the Bureau is required to consider the effects  both direct and indirect  that its project will have on the Clearfield County area, it is not required to speculate about future development.
The Third Circuit made just this point in Society Hill Towers. In that case, plaintiffs argued that the defendants had failed to adequately consider the impact of future development in a Final EA. Society Hill Towers, 210 F.3d at 182. In fact, in that case, the Administrative Record showed that planning documents existed for other developments in the area of the proposed *264 project. Id. Nonetheless, the district court held that the agency did not have to consider these "merely contemplated future actions," id., and the Third Circuit affirmed. The precise issue for the Third Circuit was when and how an agency must consider the cumulative impact of a project. The Court explained that while agencies must generally take cumulative impacts into account, they are not required to do so when other projects are unrelated or when they are "contemplated" and not formally in the works. Id.
Even Sierra Club v. Marsh, a case cited by the plaintiff, demonstrates that an agency need not speculate about future development. In that case, the agency planned to build a cargo port and causeway on Sears Island in Maine. Sierra Club, 769 F.2d at 870. In its Final EA, the agency failed to consider the impact that its project would have on the industrial development of Sears Island and the First Circuit held that this omission was fatal. Id. at 877. Throughout the Administrative Record in that case there was clear evidence that other developments, particularly an industrial park, were linked with and dependent on the development of the cargo port and causeway. Id. Indeed, documents in the Administrative Record showed that a number of developments were in the planning stages. Id. at 879. While the First Circuit admitted that an agency need not "engage in speculation," id. (citation omitted), it nonetheless found that speculation was unnecessary because the Administrative Record contained "precise" and "detailed" plans that had to be considered before the project could go forward. Id.
In the present case, plaintiff makes much of the issue of urban sprawl, but has cited nothing in the record to demonstrate that it is even a possible threat. No future development of the area is contemplated, much less in the planning stage. Requiring the agency to consider future development when the record contains no evidence that future development is even likely would force the Bureau into an exercise in guesswork and speculation. This is something that NEPA does not require. Id. at 878-79; Society Hill Towers, 210 F.3d at 180-82; Forty Most Asked Questions, 26 Fed.Reg. at 18031 ("the agency is not required to engage in speculation").

2. Hydrology
Plaintiff also claims that the Final EA ignores important hydrological concerns. Dkt. no. 63, at 32. In its Final EA, the Bureau discussed hydrological concerns in detail. First it discussed the water supply. The Pennsylvania American Water Company ("PAWC") provides service at present to the structures on Lot 1 and water lines are within a half-mile of Lot 2. According to the Final EA, PAWC officials have reported that they can accommodate the additional water demands from future developments without substantial alterations to water supply and treatment facilities. Final EA, at III-50-51; id. at IV-41 & App. B. Second, the Final EA discussed sewage. The Bureau concluded that the sewer lines are only a few years old and can accommodate the new development, id. at III-51, although they will need to be extended to the site. Id. at IV-42. The regional wastewater treatment facility has an excess capacity as well. Id. at IV-42. Having concluded that both water and sewer authorities have existing capacity to handle the project, the Bureau concluded that the project would not have a significant impact on the environment. Id. at IV-41. Based on the evidence before the agency at the time, this is a reasonable conclusion.
Plaintiff attacks this conclusion and attaches various documents to its motion for summary judgment in support of *265 its position. Dkt. no. 63, Exs. 6-10. In sum, these exhibits question the capacity of the existing PAWC facilities and they try to show that the Clearfield County project will have significant environmental effects. The problem with these documents is that they are nowhere in the Administrative Record. Judicial review of a case like the present one is tied to "the administrative record already in existence, not some new record made initially in the reviewing court." Camp, 411 U.S. at 142, 93 S.Ct. 1241. Twice before, plaintiff asked this Court to expand the Administrative Record, dkt. nos. 46 & 70, and twice I ordered the record expanded. Dkt. nos. 55 & 73. At no time, however, did plaintiff request that these documents be included in that Administrative Record. Plaintiff's attempt to raise these issues, and attach these documents, at this stage of the litigation is simply not proper.
What makes matters worse is that the Bureau welcomed public comment on the Clearfield County project for nearly nine (9) months. As many courts have explained, when a party participates in an open, public process, such as the one that took place here, it has an obligation to submit documents such as these to the agency. In Havasupai Tribe v. Robertson, 943 F.2d 32, 34 (9th Cir.1991), for instance, plaintiff, an Indian Tribe, attacked an EIS by submitting an expert report done after the EIS became final. The Ninth Circuit rejected the Tribe's attempt to expand the record in the case at such a late date. "The Tribe had some obligation to raise these issues during the comment process. Its views were solicited. Absent exceptional circumstances, such belatedly raised issues may not form a basis for reversal of an agency action." Id.; see also Vermont Yankee, 435 U.S. at 553-54, 98 S.Ct. 1197. Accordingly, I will not permit plaintiff to expand the record in this case when it failed to present these issues, and particularly these documents, before the Final EA and FONSI were complete.[28]
What the Bureau did see at the time it prepared its Final EA was a report by Dr. David Olsen, AR, Vol. XI, Item 126, Attach. K at 4-5. While Dr. Olsen raises a number of concerns about hydrology, even this report is insufficient to cast doubt on the Bureau's conclusion in this case. Dr. Olsen gives the Bureau nothing tangible to work with on the issue of hydrology. Indeed, he presents no facts, or even opinions for that matter, that undermine the Bureau's decision. Rather, his report is merely a series of rambling questions. NEPA requires that the Bureau consider some of these questions, but it does not mandate, particularly in an EA, that the Bureau explain its answer to each question in detail. According to the Administrative Record, the Bureau addressed most of these questions simply by concluding that the project would not have a significant effect on the environment. Dr. Olsen's report does not undermine the integrity of that conclusion in the least.

3. Geology
A third issue raised by plaintiff is the effect that the project will have on the *266 geology of the site. The Bureau had an expert report prepared on this very issue. Final EA, App. K. This report focused on two (2) issues. First, it examined the mining history of the proposed site and concluded that "there is a strong possibility for mine subsidence in the Women's Facility area and the northwest area of the Men's Facility/YRA." Id. App. K, at 3. Second, the report addressed the foundation requirements for the new facility. Id. App. K, at 8-14. As to this issue, it concluded that the facility could be built as long as it followed certain foundational requirements. Id. After reviewing this report, the Bureau concluded that the project would not have a significant effect on the environment. Final EA, at IV-5. And it explained that it would implement sound building practices on the site. Id.
Plaintiff's main objection is that the Bureau did not do enough study on the past mining activities at the site. In support of this conclusion, it points to the report of Dr. Ronald W. Stingelin. A.R. Vol. X, tab 125, App. K. Stingelin concludes that insufficient data exists as to the amount of undermining on the site. Id. Vol X, tab 125, App. K, at 3-4. Nonetheless, he does not suggest that construction of the site will significantly affect the environment. Instead, he merely states that the Bureau should "[c]onsult Office of Surface Mining Engineers as to the advisability and feasibility of ground stabilization prior to initiation of any facility construction." Id. Vol. X, tab 125, App. K, at 5. While the Administrative Record does not show whether the Bureau consulted the Office of Surface Mining Engineers, it does show that it consulted the Department of the Interior, the Department where the Office of Surface Mining is located. Final EA, at VII 4. No similar objection was raised by the Department of Interior. Nor did the EPA raise the same objections as those raised by Dr. Stingelin, even though it was one of the most vocal critics of the Bureau's conduct in this case. Id. at VIII, doc. nos. 26 & 40.
Nonetheless, the main reason that Stingelin's objection does not cast doubt on the Bureau's conclusion in this case is because the Bureau hired its own expert to evaluate the site. As explained already, this expert concluded that construction could proceed without harm to the environment as long as certain foundational requirements were satisfied. Id. App. K, at 8-14.
Where conflicting evidence is before the agency, the agency and not the reviewing court has the discretion to accept or reject from the several sources of evidence. The agency may even rely on its own experts, as long as the experts are qualified and express a reasonable opinion. The reviewing court may be inclined to raise an eyebrow under such circumstances, but it must show the proper respect for an agency's reasoned conclusion even if the reviewing court finds the opinions of other experts equally or more persuasive.
Sabine River Authority v. U.S. Dep't of Interior, 951 F.2d 669, 678 (5th Cir.1992). While I find nothing in Dr. Stingelin's opinion that casts doubt on the agency's conclusion, even if I did, I would be bound to follow the Bureau's reasoned judgment in this case.

4. Wetlands
As with any case involving construction of a new facility, much is made in the present case of the issue of wetlands. The Bureau considered wetlands and configured the Clearfield County project to avoid them. Final EA, at IV-13. Plaintiff objects to this analysis of wetlands, arguing that the Bureau should have formally delineated wetlands on the site. The EPA *267 also raised the same objection during the preparation of the Final EA.
[The Bureau] acknowledges that a jurisdictional determination on the existence of wetlands was not performed on the ... site and as a consequence, we cannot assess from the document the extent of the potential adverse impacts. By contrast, the information presented for the Terra Alta site indicates that personnel trained in the three-parameter approach for wetlands identification approved by the Army Corps were on site to identify and map wetlands in the affected area for this West Virginia site. Wetlands and other aquatic resources on the [Clearfield County] site should have been identified and delineated through the use of the Corps of Engineers delineation manual as was done for the Terra Alta site.
Id. at VIII, doc. no. 40, at 2-3. Indeed, the Bureau's own consultant on this project recommended back in May of 1999 that "[a] wetland delineation and request for a Jurisdictional Determination from the U.S. Army Corps on Engineers should be carried out." A.R. Vol. IV, tab 15.
Should the Bureau have formally delineated wetlands? And was its decision not to do so arbitrary and capricious? As with most of the issues posed by this case, the Bureau could have avoided these questions simply by preparing an EIS. Nonetheless, it is not my job to impose an EIS on the Bureau if it has a reasoned basis, supported by the Administrative Record, for deciding not to prepare one. In the Final EA, the Bureau describes in detail the process it went through to locate wetlands on the site, Final EA, at III-19 & Ex. III-10, how it would construct the facility to avoid any wetlands, id. and why it performed a formal delineation on the Terra Alta site, but not the Clearfield County site. Id. at VIII, response to doc. no. 40, ¶ 7. The process employed by the Bureau to locate wetlands was reasonable. Id. at III-9. The Bureau's reasons for not formally delineating wetlands are equally reasonable. Id. at VIII, response to doc. no. 40, ¶ 7. Finally, its ultimate conclusion that the construction and operation of the new facility would not have a significant effect on wetlands was reasonable as well. Perhaps the EPA would have conducted itself differently if this were its project. Under NEPA, the Bureau must "consider the comments of other agencies, but it need not defer to them when it disagrees. The [Bureau] addressed the specific comments of the [EPA], and explained why it found them unpersuasive. No more is required." Roanoke River Basin Ass'n v. Hudson, 940 F.2d 58, 64 (4th Cir.1991).
What makes the wetlands issue difficult, however, is that even the Bureau's own consultant at one point felt that a formal delineation was required. While neither party addresses this issue, I find a reasonable explanation for the Bureau's ultimate decision in the Administrative Record. The consultant's initial recommendation came very early in the process, before construction on the facility had even commenced, and at a time when the agency's NEPA's compliance was lacking. After further study on the issue was performed by Cornell, and the Bureau itself, a determination was made that there were few wetlands on the site and formal delineation was unnecessary. A.R. Vol. IV, tab 15. Indeed, the record shows that the Bureau went so far as to assure that construction of the facility would avoid even those areas that were not wetlands, but could develop into them. Id; Final EA, at III-9 & Ex. III-10. Accordingly, the Bureau had a reason for not formally delineating wetlands and the record demonstrates why the Bureau ultimately went against the initial recommendation of its consultant.

*268 5. Safety and Legality
Perhaps the largest part of the plaintiff's brief is leveled at the Bureau's analysis of the issues of safety and the legality of private prisons in Pennsylvania. Dkt. no. 63, at 36-45. There can be no doubt that the Bureau thoroughly and adequately analyzed the safety issues posed by the project. Based on extensive experience, the agency noted that the mere presence of the facility would not increase the local crime rate. Final EA, at IV-31. It explained that the facility would be prepared to handle all emergency situations and it attached an outline of Cornell's emergency plan. Id. at IV-31-32 & App. J. The Bureau also discussed the agency's plans in the event that there was a riot or major disturbance at the facility, id. at IV-32, and it indicated the expressions of support from local law enforcement facilities. Id. At the end of the day, the Bureau concluded that the impact on safety would be minimal. This conclusion is certainly reasonable. Even plaintiff does little to attack it.
Where plaintiff levels its most severe attack on the Bureau's Final EA is concerning the issue of legality. Plaintiff argues that it is illegal to run a private prison in the Commonwealth of Pennsylvania. This same argument was raised during the NEPA process by Pennsylvania Attorney General Michael Fisher and Pennsylvania Secretary of Corrections Martin Horn. Id. at VIII, doc. no. 5; id. at VIII, doc. no. 35, Attach. C.
Plaintiff's objection goes to two things. First, the Bureau's own criteria for awarding the contract in question requires that "the proposal clearly demonstrate that at the time of proposal submission the offeror has legal authority to operate a private prison housing federal inmates at the proposed site(s)." Id. at I-13. If Cornell had no authority to run the prison, plaintiff argues, then the contract should not have been granted in the first place. Second, the CEQ regulations require that an agency consider "[w]hether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment." 40 C.F.R. § 1508.27(b)(1) (emphasis added). If the Bureau failed to adequately consider this issue, then it may have violated the CEQ regulations.
To begin with, I am not sure that this legality issue implicates NEPA. First, NEPA is a procedural statute and it does not mandate substantive results. Robertson, 490 U.S. at 350, 109 S.Ct. 1835; Concerned Citizens Alliance, 176 F.3d at 705. Nonetheless, plaintiff wants me to do precisely what NEPA forbids: forever enjoin the construction of this private prison because such prisons are illegal in Pennsylvania. Second, NEPA is an environmental statute and does not require consideration of general laws if they do not otherwise implicate the environment. "The theme of § 102 [of NEPA] is sounded by the adjective `environmental': NEPA does not require the agency to assess every impact or effect of its proposed action, but only the impact or effect on the environment." Metropolitan Edison, 460 U.S. at 772, 103 S.Ct. 1556. As the Eighth Circuit explained when addressing a zoning law, "to the degree that a given ... ordinance reflects social and economic, rather than ecological, considerations, uses contrary to the ordinance do not implicate the concerns underlying ... NEPA." Olmsted Citizens, 793 F.2d at 207. Nothing in the record of this case suggests that Pennsylvania's alleged ban on private prisons exists for environmental reasons.
Even assuming that NEPA applies, the Administrative Record shows that the Bureau considered the legality of private prisons in Pennsylvania and determined *269 that such prisons were legal. For example, before deciding whether to award the contract in question, the Bureau required Cornell to explain whether it had "legal authority" to operate a private prison in Pennsylvania. Final EA, at I-13. In response, Cornell submitted a lengthy document in which it concluded that it did have such authority. Dkt. no. 72, Ex. A.[29] It discussed that Pennsylvania does not have a statute permitting private prisons, but that it also does not have a statute banning them. Id. Ex. A, at 90. This document also discussed Cornell's belief that its employees had the authority to use force and to carry lethal weapons. Id. Ex. A, at 91-92. The Bureau reviewed this document before it initially awarded the contract, dkt. no. 67, Ex. A, and it decided that awarding the contract to Cornell was proper. After a lengthy NEPA review process, in which the issue of legality was raised numerous times, the agency again concluded that it was proper to award a contract to Cornell. Final EA.
In an effort to challenge the Bureau's decision on the issue of legality, plaintiff repeatedly cites the case of Wackenhut Corrections Corporation v. United States, et al., Civil Action No. 98-1541 from the U.S. District Court for the District of Columbia. Dkt. no. 58, Ex. 3. Contrary to plaintiff's assertion, however, the Wackenhut case actually bolsters the Bureau's position that it seriously considered the issue of legality before deciding to move ahead with the Clearfield County project. In Wackenhut, the Bureau was sued by a company that was denied a contract to build a private prison in North Carolina solely because the agency thought that such prisons were illegal in North Carolina. More than anything else, this case shows that the Bureau has, in the past, taken the issue of legality seriously, so much so that it was willing to subject itself to a lawsuit on that very issue. The Administrative Record before me shows that the Bureau has taken the issue of legality seriously in this case as well. Even if NEPA applies, it requires no more.[30]

C
Finally, plaintiff has cited a number of cases in support of its position that this project will significantly affect the environment. While I will not address all of these cases, one case demonstrates the strength of the Bureau's decision: Sierra Club v. Marsh.
In that case, the First Circuit faced the question whether a cargo port and causeway project planned by the State of Maine significantly affected the environment. While the Court ultimately decided that an EIS was required, it did so mainly because the defendants failed to consider the effect that the project would have on development on Sears Island. Before reaching this conclusion, however, the Court explained in detail the "major environmental bones of contention." Sierra Club, 769 F.2d at 876. To name but a few, these included the following:
1. Clam Flats: The project would eliminate three (3) to four (4) acres of clam flats. The State of Maine, however, planned to replace just over two (2) acres of this habitat.
2. Lobsters, scallops, and other marine animals: To build the project, the defendants had to dredge 90 acres inhabited by lobsters, scallops, and other marine *270 animals. Thirty-five (35) acres of this habitat would be permanently lost.
3. Waterfowl: Evidence showed that the project would adversely affect waterfowl and other birds by encroaching on their habitat. The defendants disagreed and concluded that the impact would not be significant.
4. Upland habitat: The project would eliminate forty (40) acres of wooded habitat which supports foxes, white-tailed deer, Osprey, and Woodcock. The defendants concluded that this would not be a significant effect because it amounted to only four (4) percent of the island's total upland habitat and displaced animals could go elsewhere.
Id. at 876. Other problems included runoff from the project, tidal exchange, and dredging and spoil disposal. Id. at 876-77. After reviewing these problems, the First Circuit stated the following: "[W]ere only the above-mentioned impacts at issue, we doubt that we could say that the `FONSI' conclusions ... were `arbitrary, capricious, an abuse of discretion.' 5 U.S.C. § 706(2)(A)." Id. at 877.
If the elimination of clam flats, the wholesale removal of lobster habitat, and the leveling of forty (40) acres of wooded habitat do not constitute significant environmental effects, then the environmental impacts at issue in this case are certainly insufficient. Unlike Sierra Club, this is not a case where a federal agency is taking part in a project that will eliminate large portions of natural habitat for a number of different species. Similarly, it is not a case where a piece of land, formerly untouched by man, will forever be transformed into the center of a large-scale development plan, resulting in the commercialization of an entire region. History has not been kind to the Clearfield County site. It is a former strip mine, surrounded by strip mines. For years, it was used as a dumping ground for sludge by the Commonwealth of Pennsylvania. It has little vegetation, few species that inhabit it, and is only sparsely wooded on a small portion of one lot. Accordingly, I conclude that the Bureau's decision not to prepare an EIS was reasonable and will uphold it under NEPA.

VI
Thus far I have determined that the Bureau initially violated NEPA, that it cured this initial violation through its subsequent conduct, and that its Final EA was in complete compliance with NEPA. While the substance of the dispute between the parties is over, this litigation is not yet at its end. In its brief in support of its motion for summary judgment, plaintiff has made a request for attorney's fees under the Equal Access to Justice Act, 28 U.S.C. § 2412(d) ("EAJA"). Under the EAJA, a prevailing party in litigation against the United States, including proceedings for judicial review of agency action, is entitled to attorney's fees, "unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust." Id. § 2412(d)(1)(A). While I am sympathetic to plaintiff's request, I will not award attorney's fees until the parties have had the opportunity to brief the following issues.
First, is the plaintiff a prevailing party within the meaning of the EAJA? Cf. Buckhannon Board & Care Home, Inc. v. West Virginia Dep't of Health and Human Resources, 532 U.S. 598, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001). While I admit that the Bureau's ultimate decision to proceed with the Clearfield County project was proper under NEPA, I also recognize that the agency did initially violate the Act. Indeed, without plaintiff's initiation of this lawsuit, defendants may not have seen *271 the error of their ways and important provisions of NEPA might have been wholly ignored. I will also note that I am entering summary judgment for plaintiff insofar as it has claimed that the Bureau violated NEPA when it first awarded the contract without full compliance with the Act.
Second, assuming that plaintiff is a prevailing party, was the "position of the United States substantially justified" as that phrase is defined under the EAJA? Id.; see Hanover Potato Products, Inc. v. Shalala, 989 F.2d 123, 128 (3d Cir.1993); Morgan v. Perry, 142 F.3d 670, 682 (3d Cir.1998).[31] In answering this question, I expect the parties to address only the Bureau's conduct up to and including the award of the contract and the commencement of construction on the prison.
Third, if plaintiff is entitled to fees, how much is it entitled to? I expect plaintiff to quantify its fee and cost request and to support that request with appropriate affidavits. It is this third question that will probably be the major point of contention between the parties, as plaintiff may seek fees for this entire action and defendants may try to limit plaintiff's fees to only those legal services that led to stopping the initial violation. I make no judgment on this issue one way or the other, but only flag it as one for the parties to address. A scheduling Order concerning the fee issue is attached to this Memorandum Opinion.

VII
This is a difficult case. If the only issue before me was whether the Bureau violated NEPA when it awarded the contract to Cornell in April 1999, then I would enjoin the Clearfield County project and remand this case back to the agency. That decision would be an easy one. Likewise, if the only issue was whether the Bureau's determination of no significant impact was proper under NEPA, I would uphold the Bureau's judgment and permit this project to proceed. That too would be an easy decision. In the present case, however, these two (2) easy issues do not stand alone, but rather side by side. That unusual pairing is what makes this case difficult.
Perhaps this difficulty stems inevitably from the procedural nature of NEPA itself. If NEPA had more substantive bite, barring environmentally unwise decisions, then the Bureau's procedural missteps would have little effect on the ultimate result in this case. But NEPA is a procedural statute. It demands not good judgment, but only informed judgment. Based on the Administrative Record in this case, I conclude that the Bureau ultimately made an informed judgment. It carefully and openly scrutinized all aspects of the project. It considered alternatives, including terminating the contract to Cornell and abandoning the private prison effort altogether. And it objectively analyzed issues in a way that removed the taint of its previous error. At the end of the day, this kind of objective and informed analysis is all we can request from the agencies implementing NEPA.
An appropriate Order follows.

ORDER
AND NOW this 7th day of August, 2001, it is hereby ORDERED and DIRECTED that:
1) Plaintiff's motion for summary judgment, dkt. no. 58, is GRANTED IN PART *272 and DENIED IN PART as more fully stated in the Court's Memorandum Opinion;
2) Defendant's motion for summary judgment, dkt. no. 66, is GRANTED IN PART and DENIED IN PART as more fully stated in the Court's Memorandum Opinion;
3) The plaintiff will submit a brief, not to exceed ten (10) pages, on the availability and amount of attorney's fees as outlined in Part VI of the Memorandum Opinion by August 31, 2001. Accompanying evidentiary support for the fee award should be submitted at that time as well;
4) Defendants must file a response, not to exceed ten (10) pages, by September 14, 2001;
5) Plaintiff may file a reply, not to exceed five (5) pages, by September 28, 2001;
6) The Clerk of Courts shall mark this CASE CLOSED.
NOTES
[1] Plaintiff is an organization consisting of over 100 residents from the Clearfield County, Pennsylvania area. Dkt. no. 45, ¶ 3.
[2] The Administrative Record consists of eleven (11) volumes. Volumes I-VI can be found at dkt. nos. 18-23, Volume VII is located at dkt. nos. 24 & 57, and Volumes VIII-XI are located at dkt. nos. 40-43. Rather than cite to the particular docket number, throughout this Memorandum Opinion, when I refer to the Administrative Record, I will cite to "A.R. Vol. ___."
[3] The Final EA can be found at dkt. no. 35 and in the Administrative Record at Vol. IX, tab 116. Throughout this Memorandum Opinion, I will cite to this document as "Final EA, at ___."
[4] The issue of arsenic concentration on the proposed site is one that is extensively discussed in the Administrative Record. At one point, testing showed that arsenic concentrations exceeded the state limit. Id. at III-30. After a number of local residents complained, the Pennsylvania Department of Environmental Protection ("DEP") thoroughly investigated the site for such contamination. A.R. Vol. XI, tab 136. On May 18, 2000, the DEP took twenty-six (26) soil samples from the property. Id. On June 5, 2000, it issued a press release concluding that the arsenic at the Clearfield County site is within the range of naturally occurring levels of arsenic in the Eastern United States. Id. The United States Environmental Protection Agency ("EPA") then reviewed the samples and confirmed the DEP's findings. Id.
[5] There are no state- or federally-listed endangered or threatened species inhabiting the site. Id. at III-22 & App. B.
[6] Between May 25, 1999 and June 11, 1999, Cornell worked around the clock on the construction of the new facility. A.R. Vol. XI, tab 130. A photograph taken on the day the Stop Work Order was entered reveals that an entire portion of the proposed site had been cleared of vegetation. Id. Vol. XI, tab 128.
[7] The FONSI can be found at dkt. no. 34 and in the Administrative Record at Vol. IX, tab 117. Throughout this Memorandum Opinion, I will cite to this document as "FONSI."
[8] Passed in 1969, Congress stated the purpose of NEPA as follows: "to declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; to enrich the understanding of the ecological systems and natural resources important to the Nation; and to establish a Council on Environmental Quality." 42 U.S.C. § 4321.
[9] This EIS must consider: 1) the environmental impact of the proposed action; 2) any adverse environmental effects which cannot be avoided should the proposal be implemented; 3) alternatives to the proposed action; 4) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity; and 5) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented. 42 U.S.C. § 4332(C)(i)-(v).
[10] The CEQ has issued detailed regulations implementing NEPA's procedural requirements. See 40 C.F.R. § 1500 et seq. (1984). These regulations are given great deference by federal courts, Andrus, 442 U.S. at 358, 99 S.Ct. 2335, and have been applied in the Third Circuit with regularity. See, e.g., Morris County Trust, 714 F.2d at 276; Society Hill Towers Owners Ass'n v. Rendell, 210 F.3d 168, 180-83 (3d Cir.2000).
[11] On two (2) previous occasions, plaintiff has filed motions to expand the Administrative Record. Dkt. nos. 46 & 70. My rulings on both motions resulted in the expansion of the Administrative Record before me. Dkt. nos. 55 & 73. Because plaintiff has raised no additional objections to the Administrative Record, I can only assume that it agrees that the current record before the Court is complete. Indeed, at eleven (11) volumes and thousands of pages, the current record appears to contain all materials even remotely related to the Bureau's decisions in this case.
[12] Because NEPA does not provide a means for its own enforcement, plaintiff relies on the APA to bring its NEPA claims. Under § 706(2)(A), a district court must uphold an agency decision unless it concludes that the decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). For many years, the Third Circuit expressed uncertainty about precisely what standard applied to judicial review of an agency's decision not to prepare an EIS. Concord Township v. United States, 625 F.2d 1068, 1073-74 (3d Cir.1980) (refusing to decide whether arbitrary and capricious or reasonableness standard applied to agency's failure to prepare an EIS, but applying a reasonableness standard); Township of Lower Alloways Creek v. Public Service Electric & Gas Co., 687 F.2d 732, 742 (3d Cir.1982) (same); N.J. Dep't of Envtl. Prot., 30 F.3d at 415 n. 21 (same). Just last year, however, the Court ended this uncertainty, holding that the "arbitrary and capricious standard" applies to "an administrative decision not to prepare an EIS." Society Hill Towers, 210 F.3d at 178.
[13] Lower Alloways Creek was decided under a "reasonableness" and not an "arbitrary and capricious" standard of review. Id. at 742. Nevertheless, the principle that a plaintiff must come forward with specific evidence in support of its allegations is an old one, not bound by any standard of review.
[14] Before turning to the merits of the case, I must briefly address the issue of standing. In a Memorandum Opinion issued earlier in these proceedings, I asked plaintiff to submit affidavits or other evidence demonstrating that it had standing to assert the claims that it raises in this suit. Dkt. no. 45. Plaintiff has complied with this request. Dkt. nos. 75-100. Based on these filings, and other evidence in the Administrative Record, I conclude that plaintiff has put forth sufficient evidence to show that it has standing to raise the claims at issue in this case.

[A]n association has standing to bring suit on behalf of its members when:
(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members of the lawsuit.
Hunt v. Washington State Apple Advertising Comm'n, 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). Defendants attack plaintiff's standing on two (2) grounds. First, they claim that the affidavits submitted by plaintiff do not show when the individuals joined CACOPP. In response to defendants attack, plaintiff has submitted documentation that answers this question. Dkt. no. 104; see also A.R. Vol. IV, tabs 18-27. Second, defendants claim that plaintiff has failed to show that the interests it seeks to protect are germane to its purpose. I reject this claim as well. Nearly every affidavit submitted in this case states that the purpose of CACOPP is twofold: 1) to minimize or eliminate the "environmental impacts" of the proposed facility; and 2) to promote the dissemination of information and "full discussion" about the proposed project. See, e.g., dkt. no. 77, ¶ 7; see also dkt. no. 104. The purpose of plaintiff's lawsuit is to make certain that the environmental impacts of the project are fully analyzed, to guarantee that the Bureau does not proceed with the project without full public participation, and to ward off the potential environmental harms that will come from the building of the new prison. Without a doubt, "the interests [plaintiff] seeks to protect are germane to [its] purpose." Hunt, 432 U.S. at 343, 97 S.Ct. 2434; See also Humane Society of the United States v. Hodel, 840 F.2d 45, 53 (D.C.Cir.1988). Accordingly, I conclude that plaintiff has standing to bring this lawsuit.
[15] The agency sent letters to the FWS and the Pennsylvania Department of Conservation and Natural Resources ("PDCNR") requesting information on the presence of endangered species on the proposed site. At the time the contract was awarded, the agency had received a response from the PDCNR but not from the FWS. Id. Vol. IV, tab 13, at III-9-11.
[16] The Bureau did complete a Draft EA in April 1999 ("April 1999 Draft EA"), but the Administrative Record shows that this document was completed weeks after the contract was awarded to Cornell. A.R. Vol. IV. Tab 13. Appendix C to this document, a Phase I Environmental Site Assessment, was not completed until April 23, 1999, twenty-one (21) days after the contract was awarded. Id. Vol. IV, tab 13, App. C. Accordingly, the April 1999 Draft EA itself must not have been completed until at least that day. This document is not to be confused with the Draft EA completed by the Bureau in August 1999 after the Stop Work Order had been entered.
[17] Different standards apply to the discussion of alternatives in an EIS than in an EA. Mt. Lookout-Mt. Nebo Property Protection Ass'n v. Federal Energy Regulatory Comm'n, 143 F.3d 165, 172 (4th Cir.1998); Society Hill Towers Owners' Ass'n v. Rendell, 20 F.Supp.2d 855, 871 (E.D.Pa.1998), aff'd, 210 F.3d 168 (3d Cir.2000). While an EIS must "rigorously explore and objectively evaluate all reasonable alternatives," 40 C.F.R. § 1502.14, an EA only requires a "brief discussion ... of alternatives...." Id. § 1508.9(b). As the Eighth Circuit has stated, "the range of alternatives that reasonably must be considered decreases as the environmental impact of the proposed action becomes less and less substantial." Olmsted Citizens for a Better Community v. United States, 793 F.2d 201, 209 (8th Cir.1986); see also Sierra Club v. Espy, 38 F.3d 792, 803 (5th Cir.1994) (same); Friends of the Ompompanoosuc v. Federal Energy Regulatory Comm'n, 968 F.2d 1549, 1558 (2d Cir.1992) (same).
[18] Even if the project is not a "[n]ew Federal correctional institution project[]" which normally requires an EIS, 28 C.F.R. pt. 61, App. A, § 8(1), it is easily "similar" to such a project, which is all the CEQ regulations require. 40 C.F.R. § 1501.4(e)(2)(i).
[19] The Administrative Record is far from clear concerning just how much work was performed on the Clearfield County site before the Stop Work Order was issued. In its Final EA, the Bureau merely stated that the "site has already been altered." Final EA, at IV-64. What is clear, though, is that most of the work seems to have been done on the area that was intended for the Women's Facility, which is located on Lot 2. A.R. Vol. XI, tab 128; Final EA, Ex. III-9 & III-10; id. App. K, at 2-3. According to the record in this case, Lot 2 was approximately one-quarter wooded before construction began. Final EA, at III-18. After the site preparation, however, little remained of the trees on the site. A.R. Vol. XI., tab 128. Further, the record shows that Lot 2 was the most vulnerable to subsidence. Final EA, App. K, at 2-3; id. App. K. Mine Subsidence Criteria.
[20] For the sake of addressing this argument, I assume that the Bureau's ultimate decision not to prepare an EIS is not arbitrary, capricious, or an abuse of discretion. Obviously, if the project will have a significant effect on the environment, then I can remand this case back to the agency on that ground alone and I need not consider the issue of cure. This assumption ripens into a conclusion in Part V of this Memorandum Opinion.
[21] Although styled as a NEPA violation, technically the procedural violation at issue in Society Hill Towers fell under HUD's own regulations pertaining to UDAG grants. Id. at 174. These regulations were repealed by HUD in 1996, but the parties in Society Hill Towers agreed to apply them to the project at issue in that case. Id. at 174 n. 5.
[22] According to the Bureau, it had not paid any money to Cornell for the project. In fact, under the contract, Cornell is not entitled to payment until it actually houses the inmates in question. A.R. Vol. III, tab 12.
[23] Similar statements also appear in the Abstract to the Final EA, id. Abstract ("[t]he proposed action is to lift a Stop Work Order of a contract award to Cornell Corrections, Inc. (CCI) to house approximately 1,000 inmates in a contractor-owned/operated facility") and in the FONSI, FONSI, at 1 ("[l]ifting the Stop Work Order of a contract to [Cornell] to house approximately 1,000 inmates in a contractor-owned/operated facility would represent a significant contribution to fulfilling the Bureau's obligation to comply with the Congressional mandate").
[24] This is a wise concession because the facts of this case clearly show that the federal action requirement of 42 U.S.C. § 4332(c) has been met. See NAACP, 584 F.2d at 630 (noting that when an agency supports a project by contract, grant, loan, or other financial assistance there is a federal action within the meaning of NEPA). Additionally, statements in the Administrative Record show that the Bureau always considered the building of a private prison a major federal action within the meaning of NEPA. AR. Vol. I, tab 4, App. A, Jan. 28, 1998, Tr. at 6-7 (stating that "the act of awarding a contract to house those prisoners is considered a major federal action"); A.R. Vol. II, tab 5, App. A, Apr. 7, 1998 Tr. at 9 (same).
[25] CEQ regulations define the term "significantly" as follows:

"Significantly as used in NEPA requires considerations of both context and intensity:
(a) Context. This means that the significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality. Significance varies with the setting of the proposed action....
(b) Intensity. This refers to the severity of impact.... The following should be considered in evaluation of intensity:
(1) Impacts that may be both beneficial and adverse. A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial.
(2) The degree to which the proposed action affects public health or safety.
(3) Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.
(4) The degree to which the effects on the quality of the human environment are likely to be highly controversial.
(5) The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.
(6) The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about future consideration.
(7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts....
(8) The degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historic resources.
(9) The degree to which the action may adversely affect an endangered or threatened species or its habitat....
(10) Whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment."
40 C.F.R. § 1508.27.
[26] The regulations also define the terms "effects" and "human environment" in ways that force agencies to consider a broad range of factors before deciding whether they must prepare an EIS. "Effects," for instance, include both the "direct" and "indirect" effects "caused by the [agency's] action." 40 C.F.R. § 1508.8(a)-(b); see also Metropolitan Edison Co. v. People Against Nuclear Energy, 460 U.S. 766, 773, 103 S.Ct. 1556, 75 L.Ed.2d 534 (1983). Direct and indirect effects include ecological, aesthetic, historic, cultural, economic, social, and health-related matters. 40 C.F.R. § 1508. The term "human environment" is equally broad. Id. § 1508.14. In fact, the regulations say that it "shall be interpreted comprehensively to include the natural and physical environment and the relationship of people with that environment...." Id.
[27] The Bureau also reviewed studies and concluded that inmates' families would not relocate to the area, and that when inmates are released they would return home. Accordingly, the inmate population would not influence the overall population of the Clearfield County and Centre County areas. Id. at IV-25.
[28] This does not mean that this information is not relevant. Indeed, to the extent that these documents present new information that was not considered by the agency at the time it prepared its Final EA, the agency may have to consider it anyway. As I have previously explained, see supra IVA, NEPA places a continuing obligation on federal agencies. 40 C.F.R. § 1502.9(c)(1)(ii); Idaho Sporting Congress, 137 F.3d at 1152; Township of Springfield, 702 F.2d at 439; Marsh, 490 U.S. at 371, 109 S.Ct. 1851. Whether the Bureau needs to analyze this material and whether this material requires the preparation of a supplemental EA or even an EIS, however, is a matter best left, in the first instance, to the agency itself.
[29] This document was incorporated into the Administrative Record of this case. Dkt. no. 73.
[30] Plaintiff also raises claims about the scope of the Final EA and the Bureau's consideration of alternative sites. I fully address these issues in Part IVC.
[31] Obviously, if the defendants believe that the other exception to the EAJA for instances where "special circumstances make an award unjust," 28 U.S.C. § 2412(d)(1)(A), applies, they can raise that as well.